## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HOSTFORWEB INCORPORATED,          :
                                  :
        Plaintiff/Counterclaim-Defendant, :
                                  :
v.                                :        C. A. No. 20-CV-378-RGA-MPT
                                  :
SEAN FRANK, OC1-HOSTFORWEB,       :
LLC, and                          :
OC1-WEBHOSTINGBUZZ, LLC,          :
                                  :
        Defendants/Counterclaimants. :

### REPORT AND RECOMMENDATION

## I.    INTRODUCTION

On March 17, 2020, HostForWeb Incorporated ("HostForWeb" or "plaintiff") initiated this action against Sean Frank ("Frank"); Mohan Nadarajah ("Mohan"); Ray Rajan ("Ray"); Host For Web, Inc. ("HFW, Inc."); OC1-HostForWeb, LLC ("OC1-HFW"); and OC1-WebHostingBuzz, LLC ("OC1-WHB," collectively with OC1-HFW, the "OC1 Entities"), alleging Breach of Contract (Count I),  Fraud (Count II), and Civil Conspiracy (Count III).[1]  On July 21, 2020, plaintiff filed a First Amended Complaint ("FAC") alleging Breach of Contract (Count I), Fraud/Fraudulent Inducement (Count II), Negligent Misrepresentation (Count III), and Unjust Enrichment (Count VI [sic]).[2]  The FAC names only Frank, OC1-HFW, and OC1-WHB as defendants.[3]  On August 18, 2020, Frank and the OC1 Entities (collectively, "defendants") filed their Answer, Affirmative Defenses, and Counterclaims to the FAC ("Answer") asserting counterclaims for Declaratory Judgment (Counterclaim Count I); Breach of Contract--Settlement Agreement

---

[1] D.I. 1.
[2] D.I. 16 (FAC).
[3] *Id.*

(Counterclaim Count II); and Breach of Contract--APA (Counterclaim Count III).[4]

Currently before the court is plaintiff's motion to dismiss each of defendants' counterclaims pursuant to FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) ("Motion").[5]  For the reasons discussed below, it is recommended that plaintiff's Motion be denied in part and granted in part.

## II.   BACKGROUND

### A.   Parties and Relevant Non-Parties

1.  Plaintiff HostForWeb is an Illinois corporation with its principal place of business located in Cook County, Illinois.[6]

2.  Defendant OC1-HFW is a Delaware entity formed on February 28, 2017 to purchase the assets that are the subject of this action, and a party to a March 23, 2017 settlement agreement (the "Settlement Agreement") and one of two March 23, 2017 asset purchase agreements (the "APAs").[7]

3.  Defendant OC1-WHB is a Delaware entity also formed on February 28, 2017 to purchase the assets that are the subject of this action, and a party to the Settlement Agreement and one of the two APAs.[8]

4.  Defendant Frank is a resident of the state of New York, with a principal place of business located in New York, New York.[9]  Frank is a manager and/or materially participates in the management of defendants OC1-HFW, and OC1-WHB.[10]  Non-party

---

[4] D.I. 19 (Answer).
[5] D.I. 30.  Briefing on the motion is found at D.I. 31 (plaintiff's opening brief), D.I. 32 (defendants' answering brief), and D.I. 34 (plaintiff's reply brief).
[6] D.I. 16 at ¶ 9.
[7] *Id.* at ¶ 12; D.I. 162-2, Ex. D (Settlement Agreement); *id.*, Exs. A, B (APAs).
[8] D.I. 16 at ¶ 13.
[9] *Id.* at ¶ 11.
[10] *Id.*

2

HFW, Inc. is a Delaware corporation and a counterparty to various contractual arrangements with plaintiff.[11]

5.  Non-party Mohan is an officer and director of HFW, Inc.,[12] and a party to the two APAs as a Guarantor.[13]

6.  Non-party Ray is also an officer and director of HFW, Inc.,[14] and a party to the two APAs as a Guarantor.[15]  Mohan and Ray each had authority to conduct business and execute transactions on behalf of HFW, Inc.[16]

7.  Non-party Cloud Equity Group consists of the following affiliated entities organized under the laws of the state of New York:  Cloud Equity Group SIM LLC; Cloud Equity Group SPG LLC; Cloud Equity Investors, LLC; and Cloud Equity Group, LLC.[17]  Frank is the managing member of each Cloud Equity Group entity.[18]

## B.    Facts[19]

On August 29, 2014, plaintiff sold all of its assets to HFW, Inc. pursuant to an Asset and Stock Purchase Agreement ("Purchase Agreement").[20]  Total consideration for the sale was $2,700,000 payable in two components:  (i) $1,150,000 in cash at closing, and (ii) the execution and delivery by HFW, Inc. of a promissory note in the amount of $1,550,000 ("Promissory Note").[21]  The Promissory Note was secured by a

---

[11] *Id.* at ¶ 14.
[12] *Id.* at ¶ 15.
[13] *Id.*
[14] *Id.* at ¶ 16.
[15] *Id.*
[16] *Id.* at ¶ 17.
[17] *Id.* at ¶ 10.
[18] *Id.*
[19] **The facts recited in this section are taken from plaintiff's FAC, documents attached to the FAC, and defendants' Answer and documents attached thereto.**
[20] D.I. 16 at ¶ 19.
[21] *Id.* at ¶ 20.

Share Pledge Agreement through which HFW, Inc. granted a security interest in all assets transferred, and pledged all outstanding and issued shares of HFW, Inc. to plaintiff.[22]

On December 14, 2016, after no payments were made pursuant to the Promissory Note despite due demand, plaintiff filed suit against HFW, Inc., Ray, and Mohan in Illinois state court asserting its right to ownership of all outstanding and issued shares of HFW, Inc. (the "Illinois Action").[23]  The parties executed a litigation stay agreement ("Litigation Stay Agreement") on January 25, 2017, on the condition that defendants seek a third-party buyer for the assets of HFW, Inc.[24]  Pursuant to that agreement, plaintiff was to be paid from any sale on the following terms:

5.   The following terms are specific to the Sale: . . .

 (d) Upon Closing, HFW will pay to Plaintiff the sum of $425,000 on account of the [secured vendor financing ("VTB")].  Plaintiff will have the opportunity to receive the balance of the full principal amount of the VTB (the balance being $1,125,000, with no additional interest) out of the proceeds of the Sale, to be paid to HFW by the Buyer over two (2) years, **subject to the following**:

(i) If sales, annualized based on **the first six (6) months following Closing (the "Earn-Out Period"), have not declined by 10% or more**, Plaintiff will receive the $1,125,000 in two payments, the first on the twelve (12) month anniversary of Closing and the second on the twenty-four (24) month anniversary of Closing.  (Reasonable efforts will be made to cause these payments to be made more frequently).

(ii) If sales decline by more than 10% based on the above six (6) month calculation, the payments will be reduced by $1.10 for each $1.00 of sales decline.

(iii) These formulas reflect the sale proceed formulas that a Buyer is expected to require HFW to accept pursuant to the Sale.[25]

---

[22] *Id.* at ¶ 21.

[23] *Id.* at ¶ 22.

[24] *Id.* at ¶ 23; D.I. 16-2, Ex. C (Litigation Stay Agreement).

[25] D.I. 16-2, Ex. C at § 5(d) (emphases added).

Ray and Mohan later informed plaintiff they secured Cloud Equity Group as the Buyer.[26]  On February 27, 2017, Cloud Equity Group, and Frank as its authorized representative, created the OC1 Entities to purchase the assets of HFW, Inc.[27]

On March 23, 2017, the parties to the Illinois Action executed the Settlement Agreement and APAs authorizing Ray and Mohan's sale of HFW, Inc.'s assets to Cloud Equity Group, and for plaintiff to be reimbursed from the proceeds of that sale.[28] Plaintiff states "other than the monetary terms and parties involved, each APAs' [sic] contractual language is essentially the same."[29]  The Settlement Agreement contained the same terms as the Litigation Stay Agreement with respect to payment and monetary transfers.[30]  The Settlement Agreement also included the following relevant provisions:

### Section 2

2.  The Payment is contingent upon the Closing and Plaintiff's, Korneyev's, and TSI's acceptance of this Agreement, acknowledged by signing this Agreement and returning it to HFW.  The Payment will be paid within one (1) business day following the Closing and receipt by HFW of this Agreement signed by Plaintiff, Korneyev, and TSI.  Over the course of two (2) years, Plaintiff shall have the opportunity to receive up to the balance of the full principal amount of the VTB, being $1,125,000, with no additional interest thereon, out of the proceeds of the Sale, to be paid to Plaintiff by Buyer, **in each case in accordance with the terms and subject, in all respects, to the limitations set forth in the APAs.**[31]

### Sections 5.3, 5.4, and 5.7

5.3.  **Provided Buyer does not breach the APAs with respect to the**

---

[26] D.I. 16 at ¶ 25.
[27] *Id.* at ¶¶ 26-27.
[28] *Id.* at ¶ 36; D.I. 16-2, Ex. D.
[29] D.I. 34 at 1 n.2.
[30] D.I. 16 at ¶ 37.
[31] **D.I. 16-2, Ex. D at § 2 (emphasis added).  TouchSupport, Inc. ("TSI"), a non-party to this litigation, was also a party to the August 29, 2014 Purchase Agreement.** *See id.***, Ex. D at 1.  Non-party Alex Korneyev ("Korneyev") is the president and sole shareholder of plaintiff.**

5

**calculation of**, or the payment of, the Conditional Purchase Price (as defined in the APAs), the Plaintiff Releasors, for and in consideration of the promises and **obligations set forth in this Agreement and the APAs and for themselves and all other Plaintiff Releasors, hereby covenant not to sue Buyer relating to payment of the balance of the VTB and hereby release, waive, and forever discharge Buyer by and from all claims relating to payment** of the balance of the VTB and the Conditional Purchase Price (as defined in the APAs).

5.4.  **Provided Buyer does not breach the APAs with respect to the calculation of**, or the payment of, the Conditional Purchase Price (as defined in the APAs), the Parties acknowledge and agree that it is the Parties' intention that this Agreement **shall be effective as a bar to all financial or other recovery against the released parties described in Paragraphs 5.1, 5.2, and 5.3 above.  To the maximum extent permitted by law, the Parties covenant not to sue or to institute or cause to be instituted any action in any court** against the released parties described in Paragraphs 5.1, 5.2, and 5.3 above regarding the matters covered by the releases contained in this Agreement, subject to Paragraph 5.6.

5.7.  If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any provision of this Agreement, including without limitation a breach of the terms of the release and covenant not to sue, **the successful or prevailing party or parties shall be entitled to all attorney's fees incurred and other disbursements incurred in that action or proceeding**, in addition to any other relief to which it or they may be entitled.[32]

Following the six-month waiting period for the calculation of the earn-out, plaintiff allegedly:

[D]iscovered . . . that contrary to Sean Frank's representations the baseline input for the APAs, Target Annual Revenue, was not revenue of *active service* at close.  Instead of being based on *active service* as of close, it was artificially increased by between 10% to 20% (10% being the defining percentage of sales for the Plaintiff to receive full payment) because material amounts of inactive accounts (those cancelled, terminated or flagged for fraud) were included in the apparent calculation used to reach the Target Annual Revenue figure.  Accordingly, the Defendants designed an agreement that built in a 10% decrease thereby harming Plaintiff.[33]

---

[32] *Id.*, Ex. D at §§ 5.3, 5.4 and 5.7 (emphases added).
[33] D.I. 16 at ¶ 41 (emphases in original).

Plaintiff further alleges "Defendants and their accountant deviated from generally accepted accounting principles in calculating the Final Payment by also pushing down the revenue earned during the 6-month earnout period."[34]

Defendants' Answer details its calculation of the Target Annual Revenue and attaches a copy of the OC1 Entities' Sixth Month Final Revenue Statement and tables displaying the Adjusted Conditional Payout.[35]  The Answer avers defendants have not made final payment to plaintiff because "upon the OC1 Entities' timely initial effort to make that payment, the payment was returned to the OC1 Entities due to the fact that the account designated for the payment had apparently been closed, and, shortly thereafter, the amount was placed in dispute and made subject to indemnification by Plaintiff's filing of the Illinois Action."[36]  Efforts to make final payment allegedly demonstrate defendants are in full compliance with the APAs and that none of the provisions were breached.[37]

Defendants' Counterclaim Count I—Declaratory Judgment, alleges "[a]n actual controversy exists between Plaintiff and the OC1 Entities regarding whether the OC1 Entities breached the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price,' and ultimately the Initial Payment,"[38] and requests declaratory judgment of defendants' compliance with sections 2.3(b),  2.4(c), 2.4(f) and 2.4(g) of the APAs.[39]

Those sections provide, in pertinent part:

---

[34] *Id.* at ¶ 44.
[35] *See* D.I. 19 at ¶¶ 12-21; D.I. 19-1, Ex. 2 (Six Month Final Revenue Statement).
[36] D.I. 19 at ¶ 26.
[37] *Id.* at ¶¶ 28-29.
[38] *Id.* at ¶ 32.
[39] *Id.* at ¶ 35.

**Section 2.3(b)**

2.3(b).  **Conditional Purchase Price**.  Purchaser shall, **subject to Section 2.4 and Section 7.5**, pay an aggregate amount equal to the Conditional Purchase Price **to [Plaintiff] (on Seller's behalf)** and, if applicable, to, at Purchaser's sole election, Seller or any creditor of an Unsatisfied Lien or Other Encumbrance, in equal installments within thirty (30) days after each of the first and second annual anniversary of the Closing Date . . . .[40]

**Section 2.4(c), 2.4(f) and 2.4(g) (Calculation of Conditional Purchase Price)**

2.4(c).  Any items included in the Purchaser Revenue Statement which are **not disputed by Seller in the Seller Objections shall be deemed agreed to by Seller.**  If Seller delivers the Seller Objections and the parties do not resolve all such Seller Objections on a mutually agreeable basis within fifteen (15) Business Days after Purchaser's receipt of the Seller Objections, any Seller Objections as to which Purchaser and Seller cannot agree upon shall be submitted to **Doeren Mayhew (the "Designated Accounting Firm") for resolution as provided herein**. . . . Subject to Section 2.4(d), the **Designated Accounting Firm shall have the power, authority, and duty to resolve any outstanding Seller Objections and the decision of the Designated Accounting Firm shall be final and binding upon the Parties**.  Upon the agreement of the parties or the decision of the Designated Accounting Firm, the Purchaser Revenue Statement, as adjusted in accordance with this Section 2.4(c), if necessary, shall be final and conclusive with respect to the calculation of the Conditional Purchase Price.

2.4(f).  If the Annualized Revenue set forth in the Six Month Final Revenue Statement equals . . . (ii) **less than 90%** of the Target Annual Revenue, Purchaser shall pay to (A) Host Inc**. (on Seller's behalf)** the **Host Inc. Maximum Amount, reduced (up to the entire amount of the Host Inc. Maximum Amount) by 34% of the product of $1.10 for every $1.00 by which the Annualized Revenue set forth in the Six Month Final Revenue Statement is less than the <u>Target Annual Revenue,</u>** and (B) at Purchaser's sole election, Seller or **any creditor of an Unsatisfied Lien or Other Encumbrance**, the Maximum Conditional Purchase Price, reduced (up to the entire amount of the Maximum Conditional Purchase Price) by (1) 34% of the product of $1.10 for every $1.00 by which the Annualized Revenue set forth in the Six Month Final Revenue Statement is less than the Target Annual Revenue and (2) the amount paid to Host Inc. pursuant to Section 2.4(f)(ii)(A). . . .

(i) If the Annualized Revenue set forth in the Six Month Final

---

[40] D.I. 16-2, Ex. A at § 2.3(b) (emphases added).

Revenue Statement equals 90% (or more) of the Target Annual Revenue, Purchaser shall pay **to Host Inc. (on Seller's behalf)** an aggregate $382,500 (which amount equals the Host Inc. Maximum Amount) and to Seller (or any creditor of an Unsatisfied Lien or Other Encumbrance ) an aggregate $127,500 (which amount equals the Maximum Conditional Purchase Price, less the Host Inc. Maximum Amount) in equal installments within thirty (30) days after each of the first and second annual anniversary of the Closing Date.

2.4(g).  Notwithstanding anything in this Agreement to the contrary, **payment** of the Conditional Purchase Price pursuant to Section 2.3(b) and this Section 2.4 **remains subject, in all respects, to Section 7.5.**[41]

Defendants allege Article VII of the APAs provides broad indemnification and set-off rights which allow them to include these figures in the calculation of the Conditional Purchase Price and apply those amounts against the total amount paid to plaintiff in the final payment.[42]  Pertinent sections of Article VII provide:

### Section 7.2, 7.5(a) and 7.5(b) (Indemnification)

7.2.  **Indemnification by Seller and Each Guarantor**.  Subject to the provisions of this Article VII, Seller and . . . any . . . Guarantor, such Guarantor, **shall indemnify, hold harmless, and defend each of Purchaser** . . . (each, a "Purchaser Indemnified Party"), from and against any and all losses, Liabilities, fines, judgments, sums required to be repaid, claims, damages, settlement payments, actions or causes of action, Encumbrances, costs, and expenses (including reasonable attorneys' fees) (collectively, "Losses") incurred by any of them by reason of, arising out of, or in connection with (a) any breach of any representation or warranty by Seller or any Guarantor contained in any Transaction Document or any certificate delivered to Purchaser in connection with the Transactions; (b) any breach by Seller or any Guarantor of any of their respective covenants, obligations, or agreements contained in any Transaction Document; and (c) any Excluded Liability (collectively, "Purchaser Indemnifiable Losses").

7.5(a).  Purchaser may **set off against and recoup from any amount owed or otherwise payable by Purchaser to Seller pursuant to any of the**

---

[41] ***Id.*, Ex. A at §§ 2.4(c), (f) and (g) (emphases added).**
[42] D.I. 19 at ¶¶ 11, 21.

**Transaction Documents** (including the Conditional Purchase Price and the Holdback) and the Related Transaction APA (including the Related Transaction Conditional Purchase Price and the Related Transaction Holdback) any Purchaser Indemnifiable Losses for which **Seller or any Guarantor is obligated to indemnify** any Purchaser Indemnified Party pursuant to this Article VII. **Such set off and recoupment shall be treated as adjustments to the Purchase Price.**

7.5(b). If, at the time Purchaser is obligated to make a payment to Seller pursuant to Section 2.3 or Section 2.3 of the Related Transaction APA, one or more **Purchaser Indemnified Persons has asserted a claim for indemnification pursuant to this Article VII that has not been finally resolved, in such case, Purchaser may withhold such payments due Seller pursuant to Section 2.3 or Section 2.3 of the Related Transaction APA as security for payment of any indemnification obligations of Seller or Guarantors**. The aggregate amount of the payments withheld by Purchaser pursuant to this Section 7.5(b) shall not exceed the aggregate potential amount of the Purchaser Indemnified Persons' unresolved claim for indemnification[.][43]

Defendants' Counterclaim Count II--Breach of Contract (Settlement Agreement) alleges that "[b]ecause the OC1 Entities did not breach the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price,' Plaintiff breached Sections 5.3 and 5.4 of the Settlement Agreement by bringing this lawsuit and the prior Illinois Action."[44]

Defendants' Counterclaim Count III—Breach of Contract (APA) alleges plaintiff (as third-party beneficiary) violated the APA's forum selection clause by bringing the previous Illinois Action.[45]

### Section 8.12 (Forum Selection Clause)

8.12. **Consent to Jurisdiction**. The Parties hereby **submit to the jurisdiction of the courts of the State of Delaware or the courts of the United States located in the State of Delaware** in respect of the interpretation and enforcement of the provisions of this Agreement and the other Transaction Documents and hereby waive, and agree not to assert,

---

[43] D.I. 16-2, Ex. A at §§ 7.2, 7.5(a) and 7.5(b) (emphases added).
[44] D.I. 19, Counterclaim Count II at ¶ 38. Sections 5.3 and 5.4 are reproduced above.
[45] *Id.*, Counterclaim Count III at ¶¶ 40-44.

10

any defense in any action, suit, or proceeding for the interpretation or
enforcement of this Agreement and any other Transaction Documents,
that they are not subject thereto or that such action, suit, or proceeding
may not be brought or is not maintainable in such courts or that this
Agreement may not be enforced in or by such courts or that their property
is exempt or immune from execution, that the suit, action, or proceeding is
brought in an inconvenient forum, or that the venue of the suit, action, or
proceeding is improper.[46]

## III.   GOVERNING LAW

To survive a motion to dismiss for failure to state a claim pursuant to FED. R. CIV.

P. 12(b)(6), the counterclaims must contain factual allegations that are plausible on their

face and "enough to raise a right to relief above the speculative level . . . on the

assumption that all allegations in the complaint are true even if doubtful."[47]  The factual

allegations of the complaint are to be viewed in the light most favorable to the non-

moving party.[48]

## IV.   DISCUSSION

On September 11, 2020, plaintiff filed its Motion to dismiss each of defendants'

counterclaims.[49]

### A.   Plaintiff's Motion to Dismiss Counterclaim Count I--Declaratory Judgment

Defendants' Counterclaim Count I requests declaratory judgement that the OC1

Entities did not violate the APAs "with respect to the calculation of, or the payment of,

the Conditional Purchase Price" pursuant to 28 U.S.C. § 2201(a).[50]

Plaintiff argues defendants have no right to apply indemnification and set offs

against the final payment to plaintiff because the APAs only specify indemnification

---

[46] D.I. 16-2, Ex. A at § 8.12 (emphasis added).
[47] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
[48] *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997).
[49] D.I. 30.
[50] D.I. 19, Counterclaim Count I at ¶ 35.

obligations of "Seller" and "Guarantor."[51] Since the APAs are unambiguous and do not define plaintiff as either, it asserts defendants' declaratory judgment request must be denied.[52]

Defendants argue plaintiff is placed in the "Seller's position" with respect to the obligations imposed on each party because the APAs designate plaintiff as the party to receive payment directly from the sale of the assets.[53]  As a consequence, plaintiff allegedly "stood in Seller's shoes for purposes of receiving payments under the APAs–payments that would have otherwise been made directly to Seller under ordinary circumstances."[54]  Payments to plaintiff, therefore, should be treated the same as payments made to Seller reduced by any adjustments made to the final payment amount.[55]  Defendants argue a contrary reading of the agreement renders the indemnification and set off provisions of the contracts superfluous and illusory.[56]

Under Delaware law, the proper interpretation of a contract is a matter of law and a motion to dismiss is a "proper framework for determining the meaning of contract language. . . ."[57]  "'Delaware adheres to the "objective" theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party.'"[58]

In interpreting contract language, clear and unambiguous terms are interpreted according to their ordinary and usual meaning.  Absent some

---

[51] D.I. 31 at 1.
[52] *Id.* at 7-8.
[53] D.I. 32 at 10.
[54] *Id.*
[55] *Id.*
[56] *Id.* at 13, 15.
[57] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).
[58] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (quoting *NBC Universal v. Paxson Commc'ns*, No. Civ. A. 650-N, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).

ambiguity, Delaware courts will not distort or twist contract language under the guise of construing it.  When the language of a contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create new contract rights, liabilities and duties[.][59]

A contract will be considered ambiguous "[o]nly where the contract's language is susceptible of more than one reasonable interpretation"[60] and "[a]n unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."[61]

Defendants contend the Delaware Supreme Court's contract analysis in *Osborn* is controlling.[62]  There, Kemp entered a lease agreement with Osborn to use the upper apartment of her beach house in Slaughter Beach, Delaware.[63]  Osborn and Kemp later entered a purchase agreement for the property which became the subject of the litigation.[64]  The language of the purchase agreement at issue provides:  "I, Michael Kemp agree to pay Lucille Menicucci $275.00 per month plus utilities for twenty years for the purchase of property at 292 S. Delaware and Bay Ave. Slaughter Beach for $50,000."[65]  When Osborn's mental faculties subsequently began to decline, her niece took over Osborn's affairs.[66]  A dispute arose between the niece and Kemp resulting in litigation filed by the niece (on Osborn's behalf) over the validity of the purchase agreement.[67]

The central issue of the litigation was whether the terms of the purchase

---

[59] *Allied Capital Corp*, 910 A.2d at 1030 (footnote omitted).
[60]  *Id.*
[61] *Osborn*, 991 A.2d at 1160.
[62] D.I. 32 at 13.
[63] *Osborn*, 991 A.2d at 1156.
[64] *Id.*
[65] *Id.*
[66] *Id.* at 1157.
[67] *Id.*

agreement were sufficiently definite.[68]  Osborn argued the purchase agreement was

ambiguous and unenforceable.[69]  The court disagreed and found interpretating the

agreement's language in the manner proposed by Osborn (i.e., that $50,000 was based

on a formula outside the four corners of the contract) would render the explicit $50,000

price term "meaningless or mere surplusage" and contrary to the admonition that

Delaware courts "will not read a contract to render a provision or term 'meaningless or

illusory.'"[70]  The court thus held the contract was valid and its terms unambiguous.[71]

   The court finds *Osborn* instructive and notes that plaintiff does not respond to

defendants' arguments based on that case.  Plaintiff's argument suggests it intends to

reap all the benefits of the APAs without being impacted by the accompanying burdens.

Defendants assert plaintiff makes no contention "that the setoff amount for overdue

vendor invoices is improper, but only that it should have been set off from amounts due

to Seller" instead of plaintiff.[72]  Plaintiff does not dispute that contention.

   The court finds the relevant portions of the Settlement Agreement and APAs are

clear and unambiguous.  Section 2 of the Settlement Agreement states:  "the proceeds

of the Sale, [are] to be paid to Plaintiff by Buyer, in each case in accordance with the

terms and subject, in all respects, to the limitations set forth in the APAs."[73]  Section

2.3(b) of the APAs states:  "Purchaser shall, subject to Section 2.4 and Section 7.5, pay

an aggregate amount equal to the Conditional Purchase Price *to [Plaintiff] (on Seller's*

---

[68] *Id.* at 1157-58.
[69] *Id.* at 1159.
[70] *Id.* 1159-60 (quoting *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del.1992)).
[71] *Id.* at 1163.
[72] D.I. 32 at 12.
[73] D.I. 16-2, Ex. D § 2.

*behalf)*."[74]  Pursuant to section 2.4(f), if the Final Revenue Statement is less than 90%

(as is the case here) of the Target Annual Revenue, then "Purchaser shall pay to (A)

*Host Inc. (on Seller's behalf)* the Host Inc. Maximum Amount, reduced (up to the entire

amount of the Host Inc. Maximum Amount) by 66% of the product of $1.10 for every

$1.00 by which the Annualized Revenue set forth in the Six Month Final Revenue

Statement is less than the Target Annual Revenue[.]"[75]  Section 2.4(g) also provides

that the Conditional Purchase Price is subject to section 7.5 of Article VII of the APAs:

Indemnification.[76]  That section allows defendants to "[s]et off against and recoup from

any amount owed or otherwise payable by Purchaser to Seller pursuant to any of the

Transaction Documents (including the Conditional Purchase Price) . . . for which Seller

or any Guarantor is obligated[,]" and that these set offs are to be treated as adjustments

to the Conditional Purchase Price.[77]  Plaintiff does not dispute defendants' right to set

off indemnification expenses against the Conditional Purchase Price from Seller or any

Guarantor.

The parties' primary point of contention is the phrase "to [plaintiff] (on Seller's

behalf)."  That phrase is found five times in Article II of the APAs when referring to the

purchase price of the assets.[78]  The repetition of this language in connection with the

actual recipient of the proceeds from the sale of assets makes the parties' intent

unambiguous.  *"To plaintiff"* clearly means the payment of the Conditional Purchase

Price will flow directly to HostForWeb rather than to Seller.  A plain reading of the APAs

can only be understood to mean plaintiff can expect to receive whatever payment

---

[74] *Id.*, Ex. A § 2.3 (b) (emphasis added).
[75] *Id.*, Ex. A § 2.4 (f) (emphasis added).
[76] *Id.*, Ex. A § 2.4 (g).
[77] *Id.*, Ex. A § 7.5 (a).
[78] *See* D.I. 16-2, Ex. A, Art. II (Purchase and Sale).

amount Seller is entitled to receive, and both parties have stipulated that defendants may apply valid set offs against the Conditional Purchase Price payment under Section 2.3(b).

This conclusion is also consistent with the direction provided by *Osborn* that contracts are to be interpreted such that terms are not rendered "meaningless and illusory."[79]  Defendants argue the "OC1 Entities included favorable setoff language in Section 7.5 to protect their indemnification rights and ensure they would still be reimbursed if an indemnification event arose."[80]  Plaintiff's interpretation would result in only the Seller and Guarantor being responsible for bearing indemnification obligations to defendants[81] while plaintiff is entitled to the entire amount of the Conditional Purchase Price.  The court rejects this interpretation as it would render the contractual set off provisions meaningless.

Thus, the court recommends plaintiff's motion to dismiss defendant's Counterclaim Count I be denied.

## B.    Plaintiff's Motion to Dismiss Counterclaim Count 2--Breach of Contract (Settlement Agreement)

Defendants' Counterclaim Count II alleges the Settlement Agreement is valid and "[b]ecause the OC1 Entities did not breach the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price,' Plaintiff breached Sections 5.3 and 5.4 of the Settlement Agreement by bringing this lawsuit and the prior Illinois Action."[82]

Pursuant to section 5.3 of the Settlement Agreement:  "Provided Buyer does not breach the APAs with respect to the calculation of, or the payment of, the Conditional

---

[79] *Osborn*, 991 A.2d at 1159.
[80] D.I. 32 at 15.
[81] D.I. 31 at 8.
[82] D.I. 19, Counterclaim Count II at ¶¶ 36-38.

Purchase Price (as defined in the APAs), the Plaintiff Releasors . . . hereby covenant not to sue Buyer relating to payment of the balance of the VTB and hereby release, waive, and forever discharge Buyer by and from all claims relating to payment of the balance[.]"[83]

Section 5.4 of the Settlement Agreement recites:  "Provided Buyer does not breach the APAs . . . the Parties covenant not to sue or to institute or cause to be instituted any action in any court against the released parties described in Paragraphs 5.1, 5.2, and 5.3 above . . . ."[84]

Defendants present a plausible request for declaratory judgment that they did not breach the APAs with respect to the calculation and payment of the Conditional Purchase Price.  Therefore, defendants' Counterclaim Count II plausibly alleges plaintiff breached the Settlement Agreement by filing the current suit and the previous Illinois Action.

Thus, the court recommends plaintiff's motion to dismiss defendant's Counterclaim Count II be denied.

### C.    Plaintiff's Motion to Dismiss Counterclaim Count 3--Breach of Contract (APA)

Defendants' Counterclaim Count III—Breach of Contract (APA) alleges plaintiff (as third-party beneficiary) violated the APA's forum selection clause by bringing the previous Illinois Action.[85]

Pursuant to section 8.12 (Consent to Jurisdiction) of the APAs:  "The Parties hereby submit to the jurisdiction of the courts of the State of Delaware or the courts of

---

[83] D.I. 16-2, Ex. D at § 5.3.
[84] *Id.*, Ex. D at § 5.4.
[85] D.I. 19 at ¶¶ 40-44.

the United States located in the State of Delaware in respect of the interpretation and

enforcement of the provisions of this Agreement" and waived any objections to this

forum.[86]

      Plaintiff maintains it did not breach the forum selection clause when it filed the

Illinois Action because the "jurisdiction clause in the APAs is merely permissive as a

matter of Delaware law, and Plaintiff had no binding contractual duty to litigate in

Delaware."[87]  Plaintiff argues the forum selection clause is permissive because it does

not contain specific language mandating that the parties litigate in the state of

Delaware.[88]

      Defendants contend the issue of whether the forum selection clause is

mandatory or permissive was previously decided by the Illinois court "holding that the

provision requires litigation in Delaware and that Plaintiff's filing of the Illinois Action in

the Northern District of Illinois was accordingly in violation thereof."[89]  By filing suit in

Delaware, defendants argue plaintiff is "accepting the Illinois Court's ruling and

acknowledging that litigation was required in this jurisdiction under the APAs' terms."[90]

      "'When a contract contains a forum selection clause, [Delaware courts] will

interpret the forum selection clause in accordance with the law chosen to govern the

contract.'"[91]  Delaware courts will find a forum selection clause is mandatory, as

opposed to permissive, when "'the parties use express language clearly indicating that

the forum selection clause excludes all other courts before which those parties could

---

[86] D.I. 16-2, Ex. A at § 8.12.
[87] D.I. 31 at 3.
[88] *Id.* at 15.
[89] D.I. 32 at 19.
[90] *Id.* at 19.
[91] *Germaninvestments AG v. Allomet Corp.*, 225 A.3d 316, 331 (Del. 2020) (quoting *Bonanno v. VTB Hldgs., Inc.,* 2016 WL 614412, at *5 (Del. Ch. Feb. 8, 2016)).

otherwise properly bring an action.'"[92]  A permissive forum selection clause will authorize jurisdiction in a designated forum "but do[es] not prohibit litigation elsewhere."[93]  The Supreme Court of Delaware has found that "if the forum selection provision does not state that it is exclusive in crystalline terms, our courts will construe the provision as permissive."[94]

*In re Bay Hills* provides examples of forum selection clauses determined to be mandatory.[95]  Each contained language providing that "'any' or 'all' actions brought by the parties 'shall' be brought in" a particular jurisdiction.[96]  The court specifically noted the word "consent" is not enough to make a forum selection clause mandatory absent other "crystalline" terms.[97]

Defendants argue the word "submit" in section 8.12 makes the forum selection clause mandatory.[98]  Defendants' cited authority, however, applied New York law determining the mandatory or permissive nature of a disputed clause.[99]  In contrast to Delaware, under New York law a forum selection clause will be exclusive and mandatory if "it contains 'any language that reasonably conveys the parties' intention to select an exclusive forum.'"[100]  In *Bonanno v. VTB Holdings, Inc.*, the Delaware Court of Chancery explicitly compared the two standards and found the New York standard is

---

[92] *In re Bay Hills Emerging Partners I, L.P.*, C.A. No. 10681-VCN, 2018 WL 3217650, at *5 (Del. Ch. July 2, 2018) (quoting *Scanbuy, Inc. v. NeoMedia Techs., Inc.*, C.A. No. 9465-VCN, 2014 WL 5500245, at *2 (Del. Ch. Oct. 31, 2014)).
[93] *Id.*
[94] *Germaninvestments AG*, 225 A.3d at 337.
[95] *In re Bay Hills*, 2018 WL 3217650, at *6.
[96] *Id.*
[97] *Id.*
[98] D.I. 32 at 20; *see* D.I. 16-2, Ex. A at § 8.12.
[99] *Id.* at 20 (citing *Del Pharm., Inc. v. Access Pharm., Inc.*, 2004 WL 1631355, at *3 (Del. Ch. July 16, 2004)).
[100] *Del Pharm., Inc.*, 2004 WL 1631355, at *6 (quoting *Babcock & Wilcox Co. v. Control Components, Inc.*, 614 N.Y.S.2d 678, 682 (N.Y. Sup. Ct.1993)).

"less-exacting,"[101] in contrast to Delaware's requirement for "crystalline" language that "clearly indicates" the selected forum is exclusive.  After considering the examples referenced by *In re Bay Hills*, the court finds that section 8.12 of the APAs does not contain any of the same mandatory language.[102]

Lastly, defendants contend the Illinois Action determined the exclusivity of the forum selection clause.  By filing the action in Delaware, plaintiff accepted and acknowledged "that litigation was required in this jurisdiction under the APAs' terms." Therefore, defendants contend the law of the case doctrine and *res judicata* prevent plaintiff from relitigating the forum selections clause issue.[103]

"'As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'"[104]  Plaintiff notes that "[t]he issue of whether the jurisdiction clause is mandatory or permissive under Delaware law (which governs the APAs) was *not* raised, briefed, or decided in the Illinois proceeding."[105] Plaintiff maintains, and the court agrees, that the Illinois proceeding focused on whether plaintiff was bound to the terms of the APAs as a third-party beneficiary, not whether the forum selection clause was mandatory or permissive.[106] This issue was not decided in the Illinois Action, therefore, plaintiff's ability to raise that issue here is not be barred by the law of the case doctrine.

---

[101] 2016 WL 614412, at *7.
[102] *See* D.I. 16-2, Ex. A at § 8.12.
[103] D.I. 32 at 19.
[104] *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (quoting *Arizona v. California,* 460 U.S. 605, 618 (1983)).
[105] D.I. 34 at 9.
[106] *HostForWeb Inc. v. Cloud Equity Group SIM LLC*, No. 19 C 00075, 2019 WL 6033648, at *3 (N.D. Ill. Nov. 14, 2019).

"Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."[107]  Plaintiff notes the Illinois Action was dismissed without prejudice pursuant to FED. R. CIV. P. 12(b)(3)[108] and an "adjudication upon the merits is the opposite of a dismissal without prejudice."[109]  Thus, there was no judgment on merits, and the Illinois Action does not preclude plaintiff's claims under the doctrine of *res judicata*.

The court finds the section 8.12 forum selection clause does not contain exclusive or mandatory language under Delaware law, and that the law of the case doctrine and *res judicata* did not prohibit plaintiff's filing the Illinois Action. Consequently, defendants have not pled a plausible claim for breach of contract based on the APAs forum selection clauses.  The court recommends plaintiff's motion to dismiss defendant's Counterclaim Count III be granted.

## V.   CONCLUSION

For the foregoing reasons, it is recommended that HostForWeb's motion to dismiss defendants' counterclaims (D.I. 30) be **DENIED in Part and GRANTED in Part** as follows:

1.     Plaintiff's motion to dismiss defendants' Counterclaim Counts I and II should be **DENIED**; and

2.     Plaintiff's motion to dismiss defendants' Counterclaim Count III should be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1)(b) and (C), Fed. R. Civ. P. 72(b), and D. DEL.

---

[107] *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 502 (2001) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979)).
[108] D.I. 34 at 9.
[109] *Semtek Int'l Inc.*, 531 U.S. at 505.

LR 72.1, any objections to this Report and Recommendation shall be filed within fourteen (14) days limited to ten (10) pages after being served with the same. Any response shall be limited to ten (10) pages and filed within fourteen (14) days thereafter.

The parties are directed to the Court's Standing Order in Non-Pro Se Matters for Objections Filed under Fed. R. Civ. P. 72 dated October 9, 2013, a copy of which is found on the Court's website (www.ded.uscourts.gov).


Dated:  March 1, 2021                          /s/ Mary Pat Thynge
                                          Chief U.S. Magistrate Judge