IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

HOSTFORWEB INCORPORATED,

        Plaintiff/Counterclaim-Defendant,

        v.

SEAN FRANK, OC1-HOSTFORWEB, LLC, and
OC1-WEBHOSTINGBUZZ, LLC,

        Defendants/Counterclaimants.

Civil Action No. 20-CV-378-RGA

## MEMORANDUM OPINION

James D. Taylor, Jr. and Charles E. Davis, SAUL EWING ARNSTEIN & LEHR LLP,
Wilmington, DE; John B. Wolf, ASHMAN & STEIN, Stokie, IL,

Attorneys for Plaintiff.

John A. Sensing and Jesse L. Noa, POTTER ANDERSON & CORROON LLP, Wilmington,
DE; Branden P. Moore, MCGUIRE WOODS LLP, Pittsburgh, PA,

Attorneys for Defendants.

July 6, 2021

ANDREWS, U.S. DISTRICT JUDGE:

Before the Court is Plaintiff's Motion to Dismiss the Counterclaims for Failure to State a Claim. (D.I. 30). The motion was fully briefed. (D.I. 31, 32, 34).

## I.    BACKGROUND

On or about August 29, 2014, Plaintiff sold all its assets to non-party HFW, Inc. pursuant to an Asset and Stock Purchase Agreement, which included a secured promissory note from HFW, Inc. to Plaintiff for $1,550,000 ("VTB"). (D.I. 16 at ¶¶ 19-20; D.I. 16-2, Ex. D at 1). On December 14, 2016, Plaintiff filed suit against HFW, Inc. and its officers and directors in Illinois state court "alleging a failure to make any payments owed pursuant to the Promissory Note." (D.I. 16 at ¶¶ 15-16, 22). In January 2017, the parties executed a litigation stay agreement (the "Litigation Stay Agreement") allowing HFW, Inc. to find a third-party to buy its assets and to pay Plaintiff the amount owed from the proceeds of the sale. (*Id.* at ¶ 23; D.I. 16-2, Ex. C (Litigation Stay Agreement)). The parties later amended the Litigation Stay Agreement in February 2017 (the "Amending Agreement"). (D.I. 19-1, Ex. A).

Subsequently, Cloud Equity Group was secured as a buyer. (D.I. 16 at ¶ 25). Two entities, Defendants OC1-HostForWeb, LLC and OC1-WebHostingBuzz, LLC (the "OC1 entities"), were formed to purchase the assets of HFW, Inc. (*Id.* at ¶ 27). Defendant Sean Frank was "the authorized representative of Cloud Equity Group and managing member of each OC1 entity." (*Id.* at ¶ 31).

The sale was executed through two essentially identical Asset Purchase Agreements[1] (the "APAs") and a related settlement agreement (the "Settlement Agreement") resolving the Illinois

---

[1] There are separate APAs for each OC1 entity. Plaintiff notes, "other than the monetary terms and parties involved, each [APA's] contractual language is essentially the same." (D.I. 34 at 5 n.2.).

state court litigation. (*Id.* at ¶¶ 27-28; D.I. 16-2, Exs. A, B (APAs); D.I. 16-2, Ex. D (Settlement

Agreement)). The Settlement Agreement allowed Plaintiff to be paid directly from the proceeds

of the sale of the assets of HFW, Inc. to the OC1 entities. (*Id.* at ¶ 36). The Settlement

Agreement states:

> HFW shall provide to Plaintiff a single payment in the total gross amount
> of $425,000 USD ("Payment") by wire transfer. . . . within one (1)
> business day following the Closing and receipt by HFW of this Agreement
> . . . Over the course of two (2) years, Plaintiff shall have the opportunity to
> receive up to the balance of the full principal amount of the [secured
> vendor financing ("VTB")], being $1,125,000, with no additional interest
> thereon, out of the proceeds of the Sale, to be paid to Plaintiff by Buyer, in
> each case in accordance with the terms and subject, in all respects, to the
> limitations set forth in the APAs.

(D.I. 16-2, Ex. D at § 2). The payment included "the opportunity" to receive a conditional

payment of up to $1,125,000 from the OC1 entities payable directly to Plaintiff pursuant to a

"specified formula" set out in the APAs. (D.I. 16 at ¶¶ 37-39). The specified formula and

payment terms are defined in the Conditional Purchase Price provisions of the APAs.[2] (*See* D.I.

16-2, Exs. A, B at §§ 2.3(b), 2.4(f)-(g)). The Conditional Purchase Price includes amounts

payable to Plaintiff and amounts payable to Seller (or Seller's creditors). (*Id.*). The aggregate

amount payable to both parties is the Conditional Purchase Price. (*Id.*).

The dispute between Plaintiff and Defendants focuses primarily on the calculation and

payment of the Conditional Purchase Price. (*See* D.I. 16; D.I. 19). The relevant provisions of

the APAs with respect to the calculation and payment of the Conditional Purchase Price provide:

> 2.3(b). Conditional Purchase Price. Purchaser shall, subject to Section
> 2.4 and Section 7.5, pay an aggregate amount equal to the Conditional

---

[2] The APAs include three payment provisions that make up the total Purchase Price: (1) a Non-Conditional Purchase Price to be paid on the closing date from the Purchaser (the OC1 Entities) to Seller (HFW, Inc.), (2) a Conditional Purchase Price calculated based on future revenues and split between payments paid directly to Plaintiff "(on Seller's behalf)" and, "at Purchaser's sole election," to Seller, and (3) a Holdback amount paid directly to Seller subject to various limitations. (D.I. 16-2, Exs. A, B at §§ 2.3, 2.4(f)).

Purchase Price to [Plaintiff] (on Seller's behalf) and, if applicable, to, at Purchaser's sole election, Seller or any creditor of an Unsatisfied Lien or Other Encumbrance, in equal installments within thirty (30) days after each of the first and second annual anniversary of the Closing Date . . .

2.4(f). If the Annualized Revenue set forth in the Six Month Final Revenue Statement equals (i) 90% or more of the Target Annual Revenue, Purchaser shall, in accordance with Section 2.3(b), pay to (A) [Plaintiff] (on Seller's behalf) the Host Inc. Maximum Amount and (B) at Purchaser's sole election, Seller or any creditor of an Unsatisfied Lien or Other Encumbrance, the Maximum Conditional Purchase Price, less the Host Inc. Maximum Amount; or (ii) less than 90% of the Target Annual Revenue, Purchaser shall pay to (A) [Plaintiff] (on Seller's behalf) the Host Inc. Maximum Amount, reduced (up to the entire amount of the Host Inc. Maximum Amount) by 34% of the product of $1.10 for every $1.00 by which the Annualized Revenue set forth in the Six Month Final Revenue Statement is less than the Target Annual Revenue, and (B) at Purchaser's sole election, Seller or any creditor of an Unsatisfied Lien or Other Encumbrance, the Maximum Conditional Purchase Price, reduced (up to the entire amount of the Maximum Conditional Purchase Price) by (1) 34% of the product of $1.10 for every $1.00 by which the Annualized Revenue set forth in the Six Month Final Revenue Statement is less than the Target Annual Revenue and (2) the amount paid to [Plaintiff] pursuant to Section 2.4(f)(ii)(A). The aggregate amount payable to [Plaintiff], Seller, or any creditor pursuant to this Section 2.4(f) shall be referred to herein as the "Conditional Purchase Price".

2.4(g). Notwithstanding anything in this Agreement to the contrary, payment of the Conditional Purchase Price pursuant to Section 2.3(b) and this Section 2.4 remains subject, in all respects, to Section 7.5.

(D.I. 16-2, Exs. A, B at §§ 2.3(b), 2.4(f)-(g)).

Plaintiff alleges that Frank, on behalf of Cloud Equity Group and the OC1 entities, represented to Plaintiff that the baseline revenue figure (i.e., Target Annual Revenue) used to calculate the Conditional Purchase Price included only active service accounts at close for HFW, Inc. (D.I. 16 at ¶¶ 29, 31). Plaintiff later discovered that the Target Annual Revenue figure included inactive accounts which artificially inflated the baseline amount. (Id. at ¶ 41). Plaintiff alleges that the inclusion of these inactive accounts in the Target Annual Revenue calculation constituted fraud, or alternatively, negligent misrepresentation that harmed Plaintiff. (Id. at ¶¶

4

84, 86). In other words, if the Annualized Revenue comes in below 90% of the Target Annual Revenue, then Plaintiff's payout is reduced. Including revenues from inactive accounts in the calculation of the Target Annual Revenue figure artificially increased the Target Annual Revenue, and therefore, inherently caused Annualized Revenue to fall below 90% of the Target Annual Revenue. (*See* D.I. 16 at ¶ 41; D.I. 16-2, Exs. A, B at § 2.4(f)). Despite the reduced payout amount, Plaintiff claims "the OC1 entities [still] failed to make the final payment . . ." (D.I. 16 at ¶¶ 45, 59, 64). Plaintiff thus claims breach of contract and, in the alternative, unjust enrichment. (*Id.* at ¶ 95).

Plaintiff filed a suit against Frank and the OC1 Entities in the United States District Court for the Northern District of Illinois on January 4, 2019 (the "Illinois Action") on similar grounds. (*Id.* at ¶ 55). Plaintiff originally sued in Illinois because the Settlement Agreement included a forum selection clause requiring disputes to be brought in the State of Illinois. *See HostForWeb Inc. v. Cloud Equity Group SIM LLC*, 2019 WL 6033648, at *3 (N.D. Ill. Nov. 14, 2019). The forum selection clause reads:

> 7.10 **Governing Law**. This Agreement will be governed by the laws of the State of Illinois and the dispute shall be determined by, parties attorn to (sic), a Court of competent jurisdiction in the State of Illinois.

(D.I. 16-2, Ex. D at § 7.10).

The Illinois Court dismissed the action without prejudice "pursuant to Rule 12(b)(3) based on the Court's conclusion that venue was proper in Delaware, rather than Illinois." (D.I. 16 at ¶ 55). The court held that "this ruling is limited to determining that Plaintiff is claiming rights under the APA [as opposed to the Settlement Agreement], and as such, is bound by the forum section clause contained in the APA: Delaware." *HostforWeb Inc.,* 2019 WL 6033648, at *3. Plaintiff then filed suit in this Court. (D.I. 16).

Defendants deny that they used "any calculation that included inactive accounts in calculating any figures within the APA," and contend that the final payment had not been made to Plaintiff because "the initial payment attempt was returned due to the fact that the account designated for the payment was closed, and the amount was placed in dispute and made subject to indemnification shortly thereafter." (D.I. 19 at ¶¶ 6, 46). Defendants argue, "Section 7.5 of the APAs afford the OC1 Entities broad indemnification and setoff rights" from the Conditional Purchase Price. (*Id.* at ¶ 11). The relevant provisions state:

> SECTION 7.2 Indemnification by Seller and Each Guarantor. Subject to the provisions of this Article VII, Seller and, to the extent relating to representations, warranties, covenants, or agreements of any Guarantor, such Guarantor, shall indemnify, hold harmless, and defend each of Purchaser, its equity holders, Subsidiaries, Affiliates, officers, directors, employees, agents, representatives, successors, and assigns (each, a "Purchaser Indemnified Party"), from and against any and all losses, Liabilities, fines, judgments, sums required to be repaid, claims, damages, settlement payments, actions or causes of action, Encumbrances, costs, and expenses (including reasonable attorneys' fees) (collectively, "Losses") incurred by any of them by reason of, arising out of, or in connection with (a) any breach of any representation or warranty by Seller or any Guarantor contained in any Transaction Document or any certificate delivered to Purchaser in connection with the Transactions; (b) any breach by Seller or any Guarantor of any of their respective covenants, obligations, or agreements contained in any Transaction Document; and (c) any Excluded Liability (collectively, "Purchaser Indemnifiable Losses").

> SECTION 7.5 Setoff; Withholding of Payments.

> (a) Purchaser may set off against and recoup from any amount owed or otherwise payable by Purchaser to Seller pursuant to any of the Transaction Documents (including the Conditional Purchase Price and the Holdback) and the Related Transaction APA (including the Related Transaction Conditional Purchase Price and the Related Transaction Holdback) any Purchaser Indemnifiable Losses for which Seller or any Guarantor is obligated to indemnify any Purchaser Indemnified Party pursuant to this Article VII. Such set off and recoupment shall be treated as adjustments to the Purchase Price.

> (b) If, at the time Purchaser is obligated to make a payment to Seller

pursuant to <u>Section 2.3</u> or Section 2.3 of the Related Transaction APA, one or more Purchaser Indemnified Persons has asserted a claim for indemnification pursuant to this <u>Article VII</u> that has not been finally resolved, in such case, Purchaser may withhold such payments due Seller pursuant to <u>Section 2.3</u> or Section 2.3 of the Related Transaction APA as security for payment of any indemnification obligations of Seller or Guarantors. The aggregate amount of the payments withheld by Purchaser pursuant to this <u>Section 7.5(b)</u> shall not exceed the aggregate potential amount of the Purchaser Indemnified Persons' unresolved claim for indemnification pursuant to this <u>Article VII</u>. If, on any date, the aggregate amount of the payments withheld by Purchaser pursuant to this <u>Section 7.5(b)</u> exceeds the aggregate potential amount of the Purchaser Indemnified Persons' unresolved claim for indemnification pursuant to this <u>Article VII,</u> then Purchaser shall promptly pay to Seller the amount of such excess.

(D.I. 16-2, Ex. A, B at §§ 7.2, 7.5(a)-(b)).

In regards to these set off provisions and their relation to the payment of the Conditional Purchase Price, Defendants allege various counterclaims. Count 1 alleges, "An actual controversy exists between Plaintiff and the OC1 Entities regarding whether the OC1 entities breached the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price,' and ultimately the Initial Payment," and requests a declaratory judgment that Defendants complied with the Conditional Purchase Price provisions of the APAs. (D.I. 19 at ¶¶ 32-35).

Count II alleges, "Because the OC1 Entities did not breach the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price,' Plaintiff breached Sections 5.3 and 5.4 of the Settlement Agreement by bringing this lawsuit and the prior [litigation in Illinois]." (D.I. 19 at ¶ 38.). Sections 5.3 and 5.4 of the Settlement Agreement state:

> 5.3. **Plaintiff's, TSI's, and Korneyev's Release of Buyer and Covenant**.
> Provided Buyer does not breach the APAs with respect to the calculation of, or the payment of, the Conditional Purchase Price (as defined in the APAs), the Plaintiff Releasors, for and in consideration of the promises and obligations set forth in this Agreement and the APAs and for themselves and all other Plaintiff Releasors, hereby covenant not to sue

7

Buyer relating to payment of the balance of the VTB and hereby release, waive, and forever discharge Buyer by and from all claims relating to payment of the balance of the VTB and the Conditional Purchase Price (as defined in the APAs).

5.4. **Agreement is Bar to Claims**. Provided Buyer does not breach the APAs with respect to the calculation of, or the payment of, the Conditional Purchase Price (as defined in the APAs), the Parties acknowledge and agree that it is the Parties' intention that this Agreement shall be effective as a bar to all financial or other recovery against the released parties described in Paragraphs 5.1, 5.2, and 5.3 above. To the maximum extent permitted by law, the Parties covenant not to sue or to institute or cause to be instituted any action in any court against the released parties described in Paragraphs 5.1, 5.2, and 5.3 above regarding the matters covered by the releases contained in this Agreement, subject to Paragraph 5.6.

(D.I. 16-2, Ex. D at §§ 5.3-5.4).

Count III alleges that Plaintiff, as a third-party beneficiary, violated the forum selection clause of the APAs by bringing the previous Illinois Action, and therefore, have damaged Defendants "in the amount of their attorneys' fees and costs in defending the Illinois Action and enforcing its rights through this counterclaim." (D.I. 19 at ¶¶ 40-44). The forum selection clause of the APAs states:

The Parties hereby submit to the jurisdiction of the courts of the State of Delaware or the courts of the United States located in the State of Delaware in respect of the interpretation and enforcement of the provisions of this Agreement and the other Transaction Documents and hereby waive, and agree not to assert, any defense in any action, suit, or proceeding for the interpretation or enforcement of this Agreement and any other Transaction Documents, that they are not subject thereto or that such action, suit, or proceeding may not be brought or is not maintainable in such courts or that this Agreement may not be enforced in or by such courts or that their property is exempt or immune from execution, that the suit, action, or proceeding is brought in an inconvenient forum, or that the venue of the suit, action, or proceeding is improper.

(D.I. 16-2, Ex. A, B at § 8.12).

Plaintiff filed a Motion to Dismiss the Counterclaims for Failure to State a Claim. (D.I. 30). I referred the motion to a Magistrate Judge. The Magistrate Judge duly issued a Report and Recommendation ("Report"). (D.I. 38).

The Report recommends that Plaintiff's "motion to dismiss defendant[s'] Counterclaim Count I be denied" on the basis that "the relevant portions of the Settlement Agreement and APAs are clear and unambiguous" such that Defendants may set off indemnification amounts from payments to Plaintiff (on Seller's behalf) pursuant to Section 7.5 of the APAs. (D.I. 38 at 14-16). Because the Report recommends that Plaintiff's motion to dismiss Count I be denied, it also "recommends plaintiff's motion to dismiss defendant[s'] Counterclaim Count II be denied," because Defendants "plausibly allege[] plaintiff breached the Settlement Agreement by filing the current suit and the previous Illinois Action." (*Id.* at 17). Regarding Count III, the Report recommends that "plaintiff's motion to dismiss . . . be granted" because "the section 8.12 forum selection clause [in the APAs] does not contain exclusive or mandatory language under Delaware law, and that the law of the case doctrine and *res judicata* did not prohibit plaintiff's filing the Illinois Action." (*Id.* at 21).

Before me are Defendants' Partial Objection to the Report (D.I. 39) and Plaintiff's Response (D.I. 42), as well as Plaintiff's Objections (D.I. 40) and Defendants' Response (D.I. 41). I have considered the parties' briefings, and I now review the objections *de novo*.

## II.    STANDARD OF REVIEW

A magistrate judge may make a report and recommendation regarding a case-dispositive motion. *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 444 (3d Cir. 2005). "When reviewing the decision of a Magistrate Judge on a dispositive matter, the Court conducts a *de novo* review." 28 U.S.C. §636(b)(1); *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 379 (D.

9

Del. 2014). A motion to dismiss for failure to state a claim upon which relief may be granted is a dispositive motion. D. Del. LR 72.1(a)(3). The Court may "accept, reject, or modify the recommended disposition . . ." of the magistrate judge. FED. R. CIV. P. 72(b)(3).

### III.  LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief . . ." FED. R. CIV. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the counter-complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 558 (2007).

"Though 'detailed factual allegations' are not required, a complaint must do more than simply provide 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Davis v. Abington Mem'l Hosp.,* 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). I am "not required to credit bald assertions or legal conclusions improperly alleged in the complaint." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002). A complaint may not be dismissed, however, "for imperfect statement of the legal theory supporting the claim asserted." *See Johnson v. City of Shelby,* 574 U.S. 10, 11 (2014).

A complainant must plead facts sufficient to show that a claim has "substantive plausibility." *Id.* at 12. That plausibility must be found on the face of the complaint. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the [complainant] pleads factual content that allows the court to draw the reasonable inference that the [accused] is liable for the misconduct alleged." *Id.* Deciding whether a claim is plausible will be a "context-

specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The same general rules apply to a Rule 12(b)(6) motion to dismiss a counterclaim. *See, e.g., RAH Color Techs. LLC v. Ricoh USA Inc.,* 194 F. Supp. 3d 346, 348 (E.D. Pa. 2016).

## IV. DISCUSSION

### A. The Report's Recommendation to Deny Plaintiff's Motion to Dismiss Counterclaim Count I for Failure to State a Claim

Defendants' Counterclaim Count I states, "An actual controversy exists between Plaintiff and the OC1 Entities regarding whether the OC1 Entities breached the APAs . . ." (D.I. 19 at ¶ 32). Count I asks for "a declaratory judgment that [the OC1 Entities] did not violate the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price.'" *(Id.* at 35).

The Report recommends that Plaintiff's "motion to dismiss defendant's Counterclaim Count I be denied" on the basis that "the relevant portions of the Settlement Agreement and APAs are clear and unambiguous" such that Defendants may set off indemnities from payments to Plaintiff (on Seller's behalf) pursuant to Section 7.5 of the APAs. (D.I. 38 at 14-16). The Settlement Agreement states, "[T]he proceeds of the Sale [are] to be paid to Plaintiff by Buyer, in each case in accordance with the terms and subject, in all respects, to the limitations set forth in the APAs." (D.I. 16-2, Ex. D at § 2). The limitations at issue in the APAs allow Defendants to "[s]et off against and recoup from any amount owed or otherwise payable by Purchaser *to Seller* pursuant to any of the Transaction documents (including the Conditional Purchase Price and the Holdback) . . . for which Seller or any Guarantor is obligated to indemnify any Purchaser Indemnified Party . . ." *(Id.,* Exs. A, B at § 7.5(a)) (emphasis added). The Report concludes, "A plain reading of the APAs can only be understood to mean plaintiff can expect to receive

11

whatever payment amount Seller is entitled to receive, and both parties have stipulated that defendants may apply valid set offs against the Conditional Purchase Price payment under Section 2.3(b)." (D.I. 38 at 15-16). In other words, since Plaintiff stands in Seller's shoes for the purpose of receiving payments, Plaintiff should be subject to the same limitations as Seller, including with respect to the set off provisions.

The Report reasons that if the set offs for indemnification amounts do not apply to the Conditional Purchase Price paid to Plaintiff, then Plaintiff would be "entitled to the entire amount of the Conditional Purchase Price," and only Seller and Guarantor would bear responsibility for the indemnification obligations to Defendants. (*Id.* at 16). Such an interpretation would make the set off provisions "meaningless." *Id.* (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

Plaintiff objects to this recommendation.

First, Plaintiff argues the "APAs unambiguously impose no indemnification obligations on Plaintiff," and the "OC1 Entities breached the APAs by claiming indemnification from Plaintiff." (D.I. 40 at 7). Plaintiff "had not directly owned the assets being transferred under the APAs since 2014" and "was not the appropriate entity in 2017 to represent, warrant, or verify things that could trigger indemnification or set off rights . . ." (*Id.* at 5, 8). Defendants concede that the APAs impose no indemnification obligations on Plaintiff. (D.I. 41 at 5) ("[T]he OC1 entities are simply not 'claiming indemnification from Plaintiff.'"). Instead, Defendants claim, "[they] can set off indemnified amounts against the Conditional Purchase Price," which includes Plaintiff's portion of that amount. (*Id.* at 4).

Second, Plaintiff argues, "the OC1 Entities . . . had no right to apply a set off against sums payable to Plaintiff for indemnification claims" when the indemnification obligations apply

12

only to Seller or Guarantors. (D.I. 40 at 9). The "text and structure of Section 7.5 makes clear that . . . the set off can *only* be taken against a payment owed 'to Seller,' not payments owed [to Plaintiff]." *(Id.)* (emphasis in original). In other words, Plaintiff claims that direct payments to it are not subject to indemnification set offs because such set offs can only be taken from payments to Seller, and the contractual definition of Seller does not include Plaintiff. Plaintiff is separately referred to as "Host Inc." *(See* D.I. 16-2, Exs. A, B at 39, 250).

Plaintiff argues that because there are "two separate payment buckets" for the Conditional Purchase Price—those paid to Seller and those paid to Plaintiff—Plaintiff's "proffered reading of the plain terms does not render any provisions illusory or surplusage." (D.I. 40 at 11). Seller's payment "bucket," which could reach a maximum of approximately $1 million, is also relatively large enough that limiting the set off to Seller's payments "is not an illusory right." *(Id.)*.

Defendants argue that Plaintiff's objections "(1) ignore[] that it merely stands in the place of Seller under the APAs for purposes of receiving the adjusted Conditional Purchase Price to which Seller would have ordinarily been entitled," and "(2) conflate[] the right to indemnification with the right to set off indemnified amounts against the Conditional Purchase Price, a portion of which Plaintiff was to receive 'on Seller's behalf[.]'" (D.I. 41 at 4). Defendants claim that the set off amounts must apply to Plaintiff's payments, which they are required to pay, because Section 7.5 only refers to payments Defendants are "obligated to make" or which Seller is "owed." *(Id.* at 9). Payments to Seller are only made at the OC1 entities' "sole election," and thus, are not obligatory. *(Id.)*. Therefore, Defendants argue the set off rights would be "meaningless and illusory" if they cannot be set off from Plaintiff's obligatory portion of the Conditional Purchase Price. *(Id.* at 8-9).

13

I conclude Defendants have failed to state a claim that they did not breach the APAs with respect to the calculation or payment of the Conditional Purchase Price.

In Delaware, "the proper interpretation of [contract] language is a question of law," and "a motion to dismiss is a proper framework for determining the meaning of contract language." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). "Delaware adheres to the 'objective' theory of contracts, i.e., a contract's construction should be that which would be understood by an objective, reasonable third party." *Osborn*, 991 A.2d at 1159 (citation omitted). Each term and provision should be given effect, "so as not to render any part of the contract mere surplusage," and the interpretation should not render a term or provision "meaningless or illusory." *Id.* "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Id.* at 1159-60. "The determination of ambiguity lies within the sole province of the court." *Id.* at 1160.

A plain reading of the APAs makes clear that indemnification amounts can only be set off from payments to Seller. I disagree with Defendants' interpretation that Plaintiff "'merely stood in Seller's shoes' for purposes of" setting off indemnification amounts and that "the payments to Plaintiff (on Seller's behalf) are subject to the same terms and limitations as those relating to payments that would ordinarily be made to Seller." (D.I. 41 at 5-6).

Defendants cite to the Litigation Stay Agreement, Amending Agreement, and Settlement Agreement to suggest that Plaintiff was only receiving "payments that would have otherwise been made directly to Seller under ordinary circumstances." (*Id.* at 5). However, no agreement was ever made under these "ordinary circumstances." *Id.* The interpretation of the set off

14

provisions depends on the language the parties actually drafted and bargained for, and the language of these agreements points to the APAs as the controlling agreement for the payments to which Plaintiff is entitled. (*See* D.I. 19-1, Ex. A at § 1(iii) (Amending Agreement) ("[T]his Agreement shall be Plaintiff's full, good and irrevocable authority to have and to exercise the foregoing rights, subject to the APA in all respects, in order to enforce the payment by Purchaser to Plaintiff of any amounts to which Plaintiff is entitled as a third party beneficiary under the APA."); D.I. 16-2, Ex. D at §2 (Settlement Agreement) ("Plaintiff shall have the opportunity to . . . be paid . . . by Buyer, in each case in accordance with the terms and subject, in all respects, to the limitations set forth in the APAs."). Therefore, the terms of the APAs govern the payments to which Plaintiff is entitled.

Section 7.2 of the APAs provides that only Seller and Guarantor, not Plaintiff, owe indemnification obligations to the OC1 Entities for "Purchaser Indemnifiable Losses." (D.I. 16-2, Exs. A, B at § 7.2). Defendants do not dispute this. (D.I. 41 at 7) ("[Defendants] are not seeking indemnification from Plaintiff."). Given that Plaintiff was not a party to the APAs and not selling its own assets in the transaction, it is reasonable that Plaintiff would not be responsible for any indemnifiable losses for breaches of any representations or warranties. (D.I. 40 at 5).

Section 7.5(a) allows Defendants to set off any "Purchaser Indemnifiable Losses for which Seller or any Guarantor is obligated to indemnify" from "any amount owed or otherwise payable by Purchaser to Seller . . . (including the Conditional Purchase Price and the Holdback) . . ." (D.I. 16-2, Exs. A, B at § 7.5(a)). Section 7.5(b) similarly allows Defendants to withhold unresolved indemnification amounts from "payments due Seller." (*Id.* at § 7.5(b)). Simply put, Section 7.5 allows Defendants to directly set off indemnification amounts from payments to

15

Seller rather than first paying Seller and then subsequently recouping any indemnification amounts. The APAs do not state that indemnification amounts can be set off from payments Defendants owe Plaintiff, nor would that be a reasonable interpretation given that Plaintiff does not owe any indemnification obligations to Defendants.

Plaintiff's interpretation of the set off provisions is both reasonable and unambiguous because the APAs clearly allocate payments to Seller and payments to Plaintiff. The Holdback amount is exclusively paid to Seller, and the Conditional Purchase Price includes both payments to Seller and to Plaintiff. (*See* D.I. 16-2, Exs. A, B at §§ 2.3(b)-(c), 2.4(f)). Separate terms and provisions govern the payment of these amounts to Seller and to Plaintiff. (*See id.* at §§ 2.3(a)-(c), § 2.4(f)). To refer to Plaintiff, the APAs use the language "pay to . . . Host Inc. (on Seller's behalf)," and to refer to Seller, the APAs use the language "pay to . . . Seller." (*See, e.g., id.* at §§ 2.4(f), 2.3(c)(i)). Furthermore, Seller is explicitly defined as "Host For Web, Inc." in one APA and "Webhostingbuzz, Inc." in the other, neither of which are Plaintiff. (*Id.* at 5, 215). Therefore, the APAs set out clear and "separate buckets" for the payment amounts to Seller and to Plaintiff. When read in the context of these provisions, payments "to Seller" in Section 7.5 means such payments explicitly designated to Seller. (*Id.* at § 7.5).

The fact that the payment of the Conditional Purchase Price is "subject to . . . Section 7.5" does not invalidate Plaintiff's interpretation. (*Id.* at §§ 2.3(b), 2.4(g)). Defendants incorrectly imply from these provisions that set offs may be taken from the "total" Conditional Purchase Price as opposed to just Seller's portion of the Conditional Purchase Price. (D.I. 41 at 11). Stating that payment of the Conditional Purchase Price is subject to Section 7.5, however, does not necessarily mean that set offs may be taken from the entire Conditional Purchase Price. Since the calculation of the Conditional Purchase Price explicitly delineates between payments to

Seller and payments to Plaintiff, payment of the Conditional Purchase Price can still be subject to the set offs in Section 7.5 and only apply to Seller's portion of the payments. (*See* D.I. 16-2, Exs. A, B at §§ 2.4(f), 2.4(f)(i)-(ii), 7.5).

The maximum payable amount in Seller's "bucket" totals almost one million dollars between the Holdback amount and the portion of the Conditional Purchase Price payable to Seller. (D.I. 40 at 9 n.4). A one-million-dollar potential payment is not a trivial amount. For the Conditional Purchase Price, specifically, Defendants' own calculation allocates $375,000 for "Other Creditors and Seller" after subtracting revenue adjustments. (D.I. 19 at ¶¶ 17-19; D.I. 19-1, Ex. 3). Therefore, the potential amount available for set offs would not be illusory or meaningless if it were limited to payments to Seller.

Nevertheless, Defendants argue that set offs must apply to Plaintiff's payments because those are the only payments which Defendants have any unconditional, obligation to pay. (D.I. 41 at 8-9). They reference language in Section 7.5 such as "recoup from any amount owed," "at the time Purchaser is obligated to make a payment to Seller," and "such payments due Seller" to point out that Section 7.5 applies to obligatory payments. (*Id.*; D.I. 16-2, Exs. A, B at § 7.5). They claim that payments to Seller cannot be the "obligatory" payments contemplated by Section 7.5 for set offs because payments to Seller are only made at Defendants' sole election. (D.I. 41 at 8-9).

However, if the set offs only apply to obligatory payments, as Defendants argue, only payments to Plaintiff, and not to Seller, would be subject to set offs. It makes no sense to exclusively subject Plaintiff to indemnification set off amounts for which only Seller and any Guarantor are liable. Defendants manage to reach an alternative conclusion that the indemnifiable amount should actually be set off from both Plaintiff's portion and Seller's portion

of the Conditional Purchase Price. (D.I. 41 at 11). Defendants cannot construe the language narrowly to insist that the set offs must apply to "unconditional, obligatory" payments to Plaintiff, and yet, simultaneously construe the terms broadly to apply set offs to the entire Conditional Purchase Price which includes optional as well as obligatory payments. Therefore, in the context of Section 7.5, the terms "obligated," "due," and "owed" should be interpreted to mean amounts Defendants will pay to Seller. (D.I. 16-2, Exs. A, B at § 7.5).

Finally, had the intent of the parties really been to set off indemnification amounts from payments to both Seller and Plaintiff, they could have explicitly drafted the language to allow for setoffs from the Purchase Price or Conditional Purchase Price without expressly specifying set offs against payments to Seller. Courts ought to be reluctant about relieving sophisticated parties of the terms and provisions for which they bargained. *See Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1061-62 (Del. Ch. 2006). Defendants do not present a plausible interpretation that set offs for indemnities owed by Seller or Guarantor may be taken from Plaintiff's portion of the Conditional Purchase Price given the text and structure of the APAs.

Because set offs for indemnification amounts under Section 7.5 of the APAs cannot be taken from Plaintiff's portion of the payments, setting off such indemnities and failing to pay Plaintiff constitutes a breach of the APAs. For the foregoing reasons, I sustain Plaintiff's objection and overrule the Report's recommendation regarding Counterclaim Count I.

### B. The Report's Denial of Plaintiff's Motion to Dismiss Counterclaim Count II for Failure to State a Claim

Defendants' Counterclaim Count II alleges Plaintiff breached the Settlement Agreement. (D.I. 19 at ¶¶ 36-38). "Because the OC1 Entities did not breach the APAs 'with respect to the calculation of, or the payment of, the Conditional Purchase Price,' Plaintiff breached Sections

18

5.3 and 5.4 of the Settlement Agreement by bringing this lawsuit and the prior Illinois Action." (*Id.* at 38).

Section 5.3 of the Settlement Agreement states: "Provided Buyer does not breach the APAs with respect to the calculation of, or the payment of, the Conditional Purchase Price (as defined in the APAs), the Plaintiff Releasors . . . hereby covenant not to sue Buyer relating to payment of the balance of the VTB and hereby release, waive, and forever discharge Buyer by and from all claims relating to payment of the balance[.]" (D.I. 16-2, Ex. D at § 5.3).

Section 5.4 of the Settlement Agreement states: "Provided Buyer does not breach the APAs . . . the Parties covenant not to sue or to institute or cause to be instituted any action in any court against the released parties described in Paragraphs 5.1, 5.2, and 5.3 above. . . ." (*Id.* at § 5.4).

Since the Report finds it plausible that Defendants did not breach the APAs with respect to the calculation of the Conditional Purchase Price, and, therefore, recommends that Plaintiff's Motion to Dismiss Count I be denied, the Report also recommends "that plaintiff's motion to dismiss Counterclaim Count II be denied." (D.I. 38 at 16-17).

Because I conclude that Defendants do not state a claim that their actions complied with the APAs in regards to the payment of the Conditional Purchase Price, Defendants do not state a claim for breach of the Settlement Agreement by Plaintiff's bringing this lawsuit or the previous Illinois Action. For these reasons, I sustain Plaintiff's objection and overrule the Report's recommendation regarding Counterclaim Count II.

### C. The Report's Recommendation to Grant Plaintiff's Motion to Dismiss Counterclaim Count III for Failure to State a Claim

Count III of Defendants' Counterclaims alleges that Plaintiff breached the APAs by bringing suit in Illinois in violation of Section 8.12 of the APAs. (D.I. 19 at ¶ 42). This section

contains a forum selection clause which states, "The Parties hereby submit to the jurisdiction of the courts of the State of Delaware or the courts of the United States located in the State of Delaware in respect of the interpretation and enforcement of the provisions of this Agreement and the other Transaction Documents . . . " (D.I. 16-2, Ex. A, B at § 8.12). Defendants claim damages in the "amount of their attorneys' fees and costs in defending the Illinois Action and enforcing [their] rights through this Counterclaim." (D.I. 19 at ¶ 44).

The Report recommends that the motion to dismiss be granted as to Counterclaim III, because the forum selection clause is not mandatory under Delaware law, and neither the law of the case doctrine nor *res judicata* supports a finding that Plaintiff's filing the Illinois Action was a breach of the forum selection clause. (D.I. 38 at 21).

Defendants object to the Report's finding. (D.I. 39 at 4). First, Defendants object to the finding that the issue was not previously raised, briefed, or decided in Illinois. (*Id.*). Defendants claim that the issue had been raised because their Motion to Dismiss in the Illinois Action states, "This case should be dismissed with prejudice because the subject APA's forum selection clause *requires* that Plaintiff's claims be brought in Delaware." (*Id.* at 5-6) (emphasis in original). Additionally, Defendants claim that the Illinois Court acknowledged this issue by stating:

> Defendants move to dismiss [under] Rule 12(b)(3) for improper venue because the forum selection clause contained in the APA requires that any litigation arising under it be brought in Delaware. . . . Defendants argue that because Plaintiff alleges it is a "direct third-party beneficiary of the APA," Plaintiff is bound by the forum selection clause in the APA, which requires that any litigation arising under the APA must be brought in Delaware.

*(Id.* at 6) (citing *HostforWeb Inc.,* 2019 WL 6033648, at *3).

Plaintiff argues that the dispute in the Illinois action involved "whether Plaintiff could be subject to the APAs' forum provision as a [third-party] beneficiary and which contract was raised by the claims asserted, the Settlement Agreement vs. APAs." (D.I. 42 at 7). Plaintiff

claims the issue of whether the forum selection clause was mandatory under Delaware law was not raised. (*Id.*) No Delaware law was cited in the Illinois decision and neither Plaintiff nor Defendants argued or cited Delaware law to establish whether Section 8.12 was mandatory or permissive. (*Id.* at 8.)

I agree with the Report's conclusion that the issue before the Illinois Court involved which contract's forum selection clause applied, not whether the forum selection clause of the APAs was mandatory or permissive. (D.I. 38 at 20). The Illinois Court determined that the claims were based upon the APAs rather than the Settlement Agreement, and thus, were subject to the forum selection clause of the APAs.[3] *HostforWeb Inc.,* 2019 WL 6033648, at *3. The issue of the proper interpretation of the forum selection clause of the APAs was never raised in Illinois, and the impetus for addressing that issue—Defendants' counterclaim alleging breach of contract—was not then filed. (*See* D.I. 42 at 13).

Second, Defendants object to the Report's recommendation that law of the case does not apply to the forum selection clause. (D.I. 39 at 7-9). The law of the case applies to the "propriety of transfer orders between two courts. Once the transferor court has decided the issue of whether the suit 'could have been brought' in the transferee court, this ruling becomes the law of the case . . ." (D.I. 39 at 8) (citing *Hayman Cash Register Co. v. Sarokin,* 669 F.2d 162, 168-69 (3d Cir. 1982)).

Plaintiff argues that "the law of the case doctrine involves a discretionary exercise of court power to decline to revisit issues, but is not a straight-jacket and the Court retains the

---

[3] The *HostforWeb* opinion makes clear that the Illinois Court and the parties there were all operating under the assumption that the forum selection clause was mandatory. It is too late for Plaintiff to argue that the ruling dismissing the case in Illinois was erroneous, but it is not too late to point out that Plaintiff's filing suit in Illinois was not a breach of the forum selection clause.

power to revisit issues." (D.I. 42 at 11) (citing *In re Engel*, 124 F.3d 567, 583 (3d Cir. 1997)). It claims "it is hornbook law that an '[a]ctual decision of an issue is required to establish the law of the case. Law of the case does not reach a matter that was not decided . . . it is not enough that the matter could have been decided in earlier proceedings.'" (D.I. 42 at 11) (citing 18B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 4478 at text accompanying nn.25-27 (Westlaw)). It argues that because the issue of whether the forum selection clause was mandatory under Delaware law "was not briefed or decided in Illinois. . . that ruling is not law of the case." (D.I. 42 at 12).

"[T]he doctrine [of law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815-16 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). Law of the case is, however, subject to various exceptions. One exception is "if new evidence is available to the second judge when hearing the issue. In this situation, 'the question has not really been decided earlier and is posed for the first time; the second judge ought, therefore, to be free to render a decision.'" *Hayman Cash Register*, 669 F.2d at 169-70 (citing *United States v. Wheeler*, 256 F.2d 745, 748 (3d Cir. 1958)). Likewise, "law of the case directs a court's discretion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618 (1983).

The law of the case does not apply under these circumstances. The Illinois Court ruled, "Plaintiff is claiming rights under the APA and, as such, is bound by the forum selection clause contained in the APA: Delaware." *HostforWeb Inc.*, 2019 WL 6033648, at *3. However, the court did not decide whether the clause was mandatory or permissive under Delaware law. *Id.* Plaintiff notes, "no party presented [the Illinois Court] with Delaware case law that forum

selection clauses are to be categorized as either mandatory or permissive." (D.I. 42 at 12 n.9). Instead, Defendants only argued that the forum selection clause "requires that any litigation arising under it be brought in Delaware." (D.I. 39 at 5). This is not the same inquiry as whether the clause is permissive or mandatory under Delaware law, and thus, similar to *Hayman*, the issue "ha[d] not really been decided" in the Illinois Court. 669 F.2d at 169. Therefore, the Report correctly concluded, "[P]laintiff's ability to raise [the] issue here is not barred by the law of the case doctrine." (D.I. 38 at 20).

Third, Defendants object under the theory of judicial estoppel claiming that the "Plaintiff . . . previously conceded that the clause was mandatory." (D.I. 39 at 6). This "concession" comes from Plaintiff's brief in the Illinois Action in which it stated, "despite the Defendant[s'] agreement amongst themselves to litigate their own disputes in Delaware in the APA, they separately agreed in writing to litigate any disputes with the Plaintiff within the State of Illinois." (*Id.*) (citing D.I. 19-1, Ex. B at ¶¶ 9 -10).

Plaintiff argues that "judicial estoppel was not raised below and is thus waived." (D.I. 42 at 13). It also contends that "there is nothing in the Illinois decision or briefing saying that Plaintiff conceded [it] *breached a binding contractual obligation and [is] thus answerable in damages by filing first there,* or that the court relied on such a concession." (*Id.*) (emphasis in original).

Defendants cannot bring up new claims not made in their original briefing. *See In re National Collegiate Student Loan Trusts 2003-1, 2004-1, 2005-1, 2005-2, 2005-3,* 971 F.3d 433, 444 (3d Cir. 2020). Even so, Plaintiff's statement that Defendants had an "agreement amongst themselves to litigate their own disputes in Delaware" does not imply a concession that such agreement was a mandatory forum selection clause under Delaware law nor was Plaintiff

conceding to the fact that it breached the APAs. (D.I. 39 at 6). Therefore, Plaintiff did not take inconsistent positions and judicial estoppel does not apply.

Finally, Defendants did not object to the Report's recommendation that the forum selection clause was permissive. (D.I. 38 at 20; *see* D.I. 39). It clearly is permissive.[4] Therefore, for the foregoing reasons, Defendants do not state a plausible claim that Plaintiff breached the forum selection clause of the APAs. I adopt the Report's recommendation and grant Plaintiff's motion to dismiss Defendants' Counterclaim Count III.

### D. CONCLUSION

For these reasons, I sustain Plaintiff's Objections to the Report (D.I. 40) and overrule Defendants' Partial Objection to the Report (D.I. 39). I adopt the Magistrate Judge's Report in part with respect to Defendants' Counterclaim Count III. (D.I. 38). I overrule the Magistrate Judge's Report with respect to Counterclaims Counts I and II. I grant Plaintiff's Motion to Dismiss (D.I. 30) as to Defendants' Counterclaims Counts I, II, and III.

A separate order will be entered.

---

[4] The cases cited in the Report make this conclusion clear. But there is no reason such a conclusion would be clear to a judge sitting in another jurisdiction when no party has even raised the issue or cited any Delaware law on the issue.

24