**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

HOSTFORWEB INCORPORATED,

     Plaintiff,

    v.

SEAN FRANK, OC1-HOSTFORWEB, LLC,
and OC1-WEBHOSTINGBUZZ, LLC,

     Defendants.

C.A. No. 1:20-CV-00378 RGA

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

OF COUNSEL:

Branden P. Moore
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
(412) 667-7908 – Telephone
bmoore@mcguirewoods.com

Dated:  August 30, 2021

John A. Sensing (#5232)
Jesse L. Noa (#5973)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000 – Telephone
jsensing@potteranderson.com
jnoa@potteranderson.com

*Attorneys for Defendants*

## TABLE OF CONTENTS

INTRODUCTION & NATURE AND STAGE OF PROCEEDINGS ..........................................1

SUMMARY OF THE ARGUMENTS ...........................................................................................2

STATEMENT OF FACTS ...............................................................................................................3

STANDARD OF REVIEW ..............................................................................................................5

ARGUMENT ....................................................................................................................................5

I.      Plaintiff Has Not Alleged Facts to Establish Personal Jurisdiction Over Frank..................5

II.     Plaintiff's Non-Contract Claims are Partially Time Barred .................................................6

III.    Plaintiff's Claims are Barred by the Economic Loss and Gist of the Action Doctrines......8

IV.    Plaintiff's Misrepresentation Claims are Barred by the Agreements in Question...............9

V.     Plaintiff Otherwise Fails to Plausibly Allege Claims for Misrepresentation.....................10

          A.     Plaintiff's Allegations are Implausible ..................................................................11

          B.     The Basis for the TAR Figure, on which Plaintiff Allegedly Relied, was Immaterial ..............................................................................................................12

          C.     Plaintiff Did Not Reasonably Rely on the Alleged Representations ....................13

          D.     Plaintiff Has Not Plausibly Alleged Intent ...........................................................18

CONCLUSION ...............................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

**Page(s)**

*Brasby v. Morris*,
2007 WL 949485 (Del. Super. Mar. 29, 2007) ...............................................8-9, 14

*Brevet Cap. Special Opportunities Fund, LP v. Fourth Third, LLC*,
2011 WL 3452821 (Del. Super. Aug. 5, 2011) .......................................................13

*Davis v. 24 Hour Fitness Worldwide, Inc.*,
2014 WL 4955502 (D. Del. Sept. 30, 2014) .......................................................6, 18,

*Delaware Art Museum v. Ann Beha Architects, Inc.*,
2007 WL 2601472 (D. Del. Sept. 11, 2007) .............................................................9

*Downs v. Andrews*,
639 F. App'x 816 (3d Cir. 2016) ..............................................................................9

*El v. Davis*,
2013 WL 1914233 (D. Del. May 7, 2013) ...............................................................11

*Gea Sys. N. Am. LLC v. Golden State Foods Corp.*,
2020 WL 3047207 (Del. Super. June 8, 2020) ....................................................8, 12

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
788 A.2d 544 (Del. Ch. 2001) ................................................................................10

*H-M Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003) ................................................................................10

*Harris v. Innovate Biopharmaceuticals, Inc.*,
2019 WL 5173782 (Del. Super. Oct. 15, 2019) ...............................................16, 18

*Hostforweb Inc. v. Cloud Equity Grp. SIM LLC*,
2019 WL 6033648 (N.D. Ill. Nov. 14, 2019) .........................................................12

*In re Bendamustine Consolidated Cases*,
2015 WL 1951399 (D. Del. Apr. 29, 2015) ..............................................................5

*Int'l Bus. Machines Corp. v. Groupon, Inc.*,
289 F. Supp. 3d 596 (D. Del. 2017) ..........................................................................5

*Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*,
844 F. Supp. 2d 519 (D. Del. 2012) ....................................................................9, 20

*Lincoln Nat. Life Ins. Co. v. Snyder*,
722 F. Supp. 2d 546 (D. Del. 2010) ......................................................................6, 8

*Marshal T. Simpson Tr. v. Invicta Networks, Inc.*,
   2017 WL 4684325 (D. Del. Oct. 18, 2017) ...................................................................6

*Moore v. Middlesex Cty. Prosecutors Off.*,
   738 F. App'x 100 (3d Cir. 2018) ..................................................................................6

*Pestolite, Inc. v. Cordura Corp.*,
   449 A.2d 263 (Del. Super. Ct. 1982) ...........................................................................6

*Reach & Assocs., P.C. v. Dencer*,
   269 F. Supp. 2d 497 (D. Del. 2003) ..............................................................................5

*Richie v. Hillstone Env't Partners, LLC*,
   2019 WL 2995178 (D. Del. July 9, 2019) ...................................................................8

*S.C. Johnson & Son, Inc. v. Dowbrands, Inc.*,
   111 F. App'x 100 (3d Cir. 2004) ......................................................... 10, 13, 17-18

*Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*,
   2014 WL 108895 (Del. Ch. Jan. 13, 2014) ................................................................14

*Westchester Fire Ins. Co. v. Household Int'l, Inc.*,
   167 F. App'x 895 (3d Cir. 2006) .................................................................................17

## RULES & STATUTES

FED. R. CIV. P. 4(e) ............................................................................................................5

FED. R. CIV. P.  12(b)(6) ............................................................................................... 5-6

FED. R. CIV. P. 12(c) .....................................................................................................1, 5

10 DEL. C. § 3104 ....................................................................................................... 5-6

Defendants Sean Frank ("Frank"), OC1-HostForWeb, LLC, and OC1-WebHostingBuzz, LLC (collectively, the "OC1 Defendants," and together with Frank, "Defendants") pursuant to Fed. R. Civ. P. 12(c), state as follows in support of their Motion for Judgment on the Pleadings (the "Motion") against Plaintiff HostForWeb Incorporated ("Plaintiff" or "Korneyev").

## INTRODUCTION & NATURE AND STAGE OF PROCEEDINGS

This case relates to a series of transactions involving Plaintiff as a creditor, alleged owner, and billing and management services provider to two companies, the assets of which were being sold by Sellers (defined below) to the OC1 Defendants. As part of this arrangement, Plaintiff agreed to settle litigation against Sellers over debts and Sellers' alleged malfeasance with respect to the companies' finances, in exchange for the right to be paid directly by the OC1 Defendants from the proceeds of those sales.  The two Asset Purchase Agreements ("APAs") were drafted by the OC1 Defendants and Sellers accordingly, and included a detailed earnout formula, all of which was approved by Plaintiff in advance. This Motion focuses on the lack of personal jurisdiction over Frank and Plaintiff's partially time-barred, non-contractual claims in this case, namely for intentional and negligent misrepresentation. These claims are based on the notion that Defendants, including Frank, the OC1 Defendants' representative, fraudulently or recklessly induced Plaintiff into settling litigation with Sellers through two separate email communications facilitating the transactions under the APAs.  Specifically, Plaintiff claims that it was induced to enter into: (1) an amendment to its Litigation Stay Agreement with Sellers (the "Amending Agreement") through representations by Frank on March 1, 2017 (Exhibit A), regarding the basis for the agreed and defined $3,603,000 baseline "Target Annual Revenue" figure underlying the APAs' earnout formula ("TAR"); and (2) a Settlement Agreement with Sellers through other representations by the OC1 Defendants' attorney, Benjamin Hantz ("Hantz") on March 23, 2017 (Exhibit C)

1

regarding (a) the same baseline and (b) an interpretation of the APAs regarding the order of payment thereunder.  However, Defendants are entitled to judgment on these claims for the several, independent reasons below.

## SUMMARY OF THE ARGUMENTS

1.      This Court does not have jurisdiction over Frank as he is a New York citizen with no ties to Delaware except as the authorized representative for the OC1 Defendants, and none of the alleged conduct took place in or was directed towards Delaware or any Delaware entity.

2.      Plaintiff's claims are time-barred under the three-year statute to the extent they are based on Frank's alleged March 1, 2017, representations because Plaintiff filed its Complaint on March 17, 2020.  Plaintiff has not alleged facts, as required, sufficient to allege tolling.

3.      Plaintiff's intentional misrepresentation claim is at least partially barred under the economic loss and gist of the action doctrines because one of the alleged misrepresentations involves the performance of an obligation under the APAs, and Plaintiff's negligent misrepresentation claim is fully barred by the economic loss doctrine because Plaintiff alleges only pecuniary losses and no Defendant is in the business of supplying information.

4.      The plain language of the Amending Agreement and Settlement Agreement precludes Plaintiff from arguing that it relied on any representations prior to their execution.

5.      Plaintiff's misrepresentation claims are implausible because, *inter alia*, they rely on the unalleged notion that Sellers, with knowledge of their own companies' financials, either based the sale of those companies on inaccurate information to their own detriment or intentionally bolstered TAR to their own detriment.

6.      The information on which Plaintiff allegedly relied was immaterial because, regardless of what Defendants allegedly represented as the basis for the TAR figure, the resulting

2

earnout payment to Plaintiff would not have changed as the TAR figure was defined in the APAs.

7.      Plaintiff has not plausibly alleged intent based on the plain language of the email exchanges in question and because Plaintiff's consent was unnecessary for the APAs' execution.

8.      Plaintiff did not reasonably rely on the alleged representations because, *inter alia*, it had equal access to company revenue and billing data and the email communications themselves paint a very different picture than as alleged.

9.      Because the intentional misrepresentation claim should be dismissed, the demand for punitive damages should be stricken.  Plaintiff's claim for attorneys' fees should also be stricken because it has alleged no entitlement to such relief.

10.     Plaintiff's unjust enrichment claim should be dismissed because valid contracts govern the parties' relationship and no Defendant was plausibly enriched on the facts alleged.

### STATEMENT OF FACTS

Plaintiff's owner, Alex Korneyev ("Korneyev"), also owned, sold, and then purportedly reclaimed a company known as Host For Web, Inc. ("HFW"). *See* Am. Compl. (D.I. 16) ("AC") ¶¶ 19–22; Ex. D ¶¶ 1–2, 8–11, 26.[1] Korneyev also owned another company that provided management and support services, including billing support, to HFW.  *See* Ex. D ¶¶ 2–3, 12–13, 15, Ex. 4. In this role, Korneyev had access to HFW's, as well as related company Webhostingbuzz Inc.'s ("WHB") (together with HFW, the "Companies"), financial information, including billing, account, and revenue data.  *See, e.g.*, *id.*; Ex. B;[2] D.I. 16-2, Ex. C, Recitals.  Knowing through this access that HFW was in a dire financial situation, Plaintiff sued the two individuals who previously purchased HFW from Plaintiff ("Sellers") due to their alleged corporate financial malfeasance and

---

[1]  Exhibit D hereto is Plaintiff's *Verified* Complaint filed in Cook County, Illinois, with exhibits.
[2]  Exhibit B is an Excel spreadsheet compiled by Korneyev and attached in an email to Frank (Ex. A) referenced in the Amended Complaint, which contains detailed revenue data for the Companies.

failure to compensate Plaintiff in connection with the sale.  *See generally* Ex. D.

On January 26, 2017, Plaintiff and Sellers signed a Litigation Stay Agreement (D.I. 16-2, Ex. C) ("LSA"), pursuant to which Sellers would seek to sell the Companies, and Plaintiff (rather than Sellers) would directly receive the sales proceeds as payment to settle the lawsuit under an earnout formula, the basics of which were set forth therein and approved by Plaintiff.  *See* LSA § 5(d). Sellers eventually identified Cloud Equity Group as the buyer,[3] with Frank as its authorized representative. AC ¶¶ 25–26. On February 10, 2017, after Sellers and Defendants negotiated terms, Defendants provided draft APAs[4] to Plaintiff.  AC ¶ 30; Amending Agreement (D.I. 19-1) § 1(i). The APAs contained a detailed earnout formula, including the base TAR figure expressly defined as $3,603,000, pursuant to which Plaintiff would receive payment on Sellers' behalf.  *Id.*; APAs.

On February 28, 2017, notwithstanding that it was all explicitly set forth in the draft APAs, Korneyev began asking Frank about how the APAs' formula "works" and to identify the formula's "benchmark" or "baseline" or "base measurement."  *See* Ex. A.[5]  Frank allegedly represented that the formula was based on "annualized revenue" from "active services" on March 1, 2017.  *See id.*

Korneyev alleges that he relied on Frank's "active services" representation in entering into the Amending Agreement on March 5, 2017. AC ¶ 34. Nevertheless, on March 23, 2017, Korneyev continued to ask his attorney, John Wolf, about the formula. *See* Ex. C (nos. 1, [5]).[6] Korneyev's counsel then passed those questions to the OC1 Defendants' counsel, Hantz.  *Id.*  Korneyev alleges that he relied on Hantz's responses through Wolf in entering into a Settlement Agreement (D.I. 16-2, Ex. D) with Sellers, which included the OC1 Defendants as a nominal party.  AC ¶ 81.

---

[3]  The OC1 Defendants were created to purchase the Companies' assets.  AC ¶ 27.
[4]  The APAs are attached as Exhibits A and B to the Amended Complaint.  *See* D.I. 16-2.
[5]  Exhibit A is the emails Plaintiff claims induced it into the Amending Agreement.  *See* AC ¶ 31.
[6]  Exhibit C is the emails Plaintiff claims induced it into Settlement Agreement. *See* AC ¶¶ 53–54.

## STANDARD OF REVIEW

"The purpose of judgment on the pleadings is to dispose of claims where the material facts are undisputed and judgment can be entered on the competing pleadings and exhibits thereto, and documents incorporated by reference." *Int'l Bus. Machines Corp. v. Groupon, Inc.*, 289 F. Supp. 3d 596, 600 (D. Del. 2017) (citations omitted). A Rule 12(c) motion "'is analyzed under the same standards that apply to a Rule 12(b)(6) motion.'" *In re Bendamustine Consolidated Cases*, 2015 WL 1951399, at *1 (D. Del. Apr. 29, 2015) (citation omitted). "But the [C]ourt is 'not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Id.* (citation omitted).

## ARGUMENT

### I.    Plaintiff Has Not Alleged Facts to Establish Personal Jurisdiction Over Frank.

As Plaintiff's pleadings make clear, this Court does not have personal jurisdiction over Frank. He is a New York citizen with no ties to Delaware except as the authorized representative for the two Delaware entities in this case, and none of the alleged conduct took place in or was directed towards Delaware or even any Delaware entity. "In order for personal jurisdiction to exist two requirements, one statutory and one constitutional, must be satisfied." *Reach & Assocs., P.C. v. Dencer*, 269 F. Supp. 2d 497, 502 (D. Del. 2003). First, a district court may assert personal jurisdiction over a nonresident if authorized by the law of the state in which it sits. *See* Fed. R. Civ. P. 4(e); 10 Del. C. § 3104(c). Second, the exercise of jurisdiction must also comport with the Due Process Clause of the U.S. Constitution. *Dencer*, 269 F. Supp. 2d at 502.

Here, none of the factors set forth in Delaware's long-arm statute have been alleged, and, indeed, cannot be alleged against Frank. *See* 10 Del. C. § 3104(c)(1)-(6). Plaintiff fails to make *any* allegations regarding jurisdiction or venue whatsoever. Instead, Plaintiff concedes that Frank

5

is a citizen of New York. *See* AC ¶ 11. Plaintiff has not made any allegations that Frank has or had any contacts with Delaware at all. Plaintiff alleges only that Frank is a managing member of the OC1 Defendants. *Id.* Even if that were true, such status, without more, is insufficient to establish jurisdiction over Frank in this Court in connection with Plaintiff's claims. *See Pestolite, Inc. v. Cordura Corp.*, 449 A.2d 263, 267 (Del. Super. Ct. 1982); *Dencer*, 269 F. Supp. 2d at 504 n.2, 506–07. Thus, the claims against Frank should be dismissed for lack of personal jurisdiction.

## II.    Plaintiff's Non-Contract Claims are Partially Time Barred.

Under Delaware law, Plaintiff's claims for intentional and negligent misrepresentation are subject to a three-year statute of limitations. *See Lincoln Nat. Life Ins. Co. v. Snyder*, 722 F. Supp. 2d 546, 562 (D. Del. 2010) (citing 10 *Del. C.* § 8106). Here, Frank's alleged representations occurred on March 1, 2017. *See* AC ¶ 31. However, Plaintiff did not file its Complaint in this Delaware action until over three years later, on March 17, 2020. *See* Compl. (D.I. 1).[7]

Under Delaware law, a claim accrues when the wrongful act occurs, "regardless of whether the plaintiff is ignorant of the wrong." *Davis v. 24 Hour Fitness Worldwide, Inc.*, 2014 WL 4955502, at *3 (D. Del. Sept. 30, 2014) (citations omitted). Although the statute may be tolled for "fraudulent concealment," Plaintiff bears the burden of demonstrating tolling ***through its pleadings***, and "relief from the statute extends only until the plaintiff is put on inquiry notice." *Marshal T. Simpson Tr. v. Invicta Networks, Inc.*, 2017 WL 4684325, at *7 (D. Del. Oct. 18, 2017).

> "No theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong." . . . A plaintiff is "on inquiry notice if [he] is in possession of facts sufficient to make [him] suspicious, or that ought to make [him] suspicious." "While the 'plaintiff-friendly inferences' required of a Rule 12(b)(6) analysis applies to the timeliness of claims, it 'does not govern assertion of tolling exceptions to the operation of a statute of limitations' . . . and a plaintiff 'asserting a tolling exception ***must plead facts*** supporting the applicability of that exception.'"

---

[7] Although Plaintiff filed suit in the Northern District of Illinois, that filing did not toll the statute of limitations because it was dismissed without prejudice and is thus "treated as if it never existed." *See Moore v. Middlesex Cty. Prosecutors Off.*, 738 F. App'x 100, 104 (3d Cir. 2018).

6

*Id.* (emphasis added) (citations omitted).  Here, even if a misrepresentation occurred as alleged (it did not), Plaintiff has not alleged facts sufficient to support tolling.  To the contrary, given the revenue information in its possession and the suspicion that should have been raised regarding any representations about the Companies' finances due to Sellers' alleged conduct, Plaintiff was on inquiry notice when the alleged March 1, 2017, representations were made.  *See, e.g.*, Exs. B, D.

Plaintiff alleges only that it "was limited by the selling parties in accessing necessary information and was forced to communicate directly with Sean Frank."  *See* AC ¶ 3.  Plaintiff does not, and cannot, allege that it lacked the information to confirm Frank's alleged misrepresentation because Korneyev had information regarding the Companies' revenue.[8]  Thus, Plaintiff "should have been aware, of facts giving rise to the [alleged] wrong" because it had the information to confirm the accuracy of the alleged representations and also every reason to be suspicious about the Companies' financials given the verified allegations in its then-ongoing suit against Sellers.[9]

Although Plaintiff generally alleges that Defendants "concealed" the true basis for the TAR, *see* AC ¶ 79, Plaintiff does not allege (nor could it) that Defendants took steps to prevent it from exercising reasonable diligence to investigate Frank's alleged misrepresentation through readily available information. Tolling for fraudulent inducement "requires a showing that the [defendant] affirmatively acted to conceal the fraud in question.  The statute of limitations would

---

[8]  *See* Exs. A–B ("For example, in Jan of 2016, monthly revenue is around 110k, however, now it is around 80k / month.") ("Please see attached excel," Exhibit B, containing detailed information regarding the Companies' revenue); Ex. D ¶¶ 2–3, 12–13, 15, 16(A), Ex. 4; AC ¶¶ 33, 42.  Even if Plaintiff lacked any necessary information (and there is no indication that it actually did), it had every right to request that information as an alleged owner of the company, by virtue of its litigation against Sellers, and pursuant to the LSA. *See, e.g.*, AC ¶ 22 ("Plaintiff exercised its right to take ownership of all of the outstanding and issued shares of HFW, Inc. . . ."); LSA § 8 ("Plaintiff, TSI and Korneyev will be kept informed. . ."); Ex. D ¶¶ 11 ("Plaintiff has the sole right to own and control HFW, Inc."), 16(C) (stating that Plaintiff put the companies' CEO "in place").
[9]  *See, e.g.*, Ex. D (alleging detailed malfeasance regarding the Companies' finances); AC ¶ 3 (alleging Sellers' actions forced Plaintiff to speak with Frank about the basis for the TAR).

then be tolled only until plaintiff discovers or, exercising reasonable diligence, could have discovered its injury." *Lincoln Nat. Life Ins. Co.*, 722 F. Supp. 2d at 563 (citations omitted). There is no plausible allegation that Frank "affirmatively acted to conceal the fraud in question." To the contrary, Frank made the alleged representations with full knowledge of Plaintiff's ability to confirm them based on Plaintiff's access to company financial data. Indeed, during that same interaction, Plaintiff sent Frank a spreadsheet containing detailed Company revenue data. *See* Exs A–B. Therefore, for each of these independent reasons, Plaintiff's claims regarding the alleged March 1, 2017, representations are time-barred.

**III.      Plaintiff's Claims are Barred by the Economic Loss and Gist of the Action Doctrines.**

For its intentional misrepresentation claim, Plaintiff alleges in part that "the closing was induced in part by the confirmation by Sean Frank's agent that Plaintiff would be 'satisfied' before anyone else with respect to the earnout." AC ¶ 80. However, this goes to the heart of Plaintiff's breach of contract claim. *See, e.g.*, *id.* at ¶¶ 60–66. "[F]or contract and tort claims to co-exist in an action, the plaintiff must allege that the defendant breached a duty that is independent of the duties imposed by the contract." *Brasby v. Morris*, 2007 WL 949485, at *7 (Del. Super. Mar. 29, 2007) (citations omitted). "Although fraudulent inducement is a recognized exception to the economic loss doctrine, the exception does not apply where, as here, the fraud claim relates to the performance under the contract, as opposed to inducement of the contractual relationship." *Richie v. Hillstone Env't Partners, LLC*, 2019 WL 2995178, at *4 (D. Del. July 9, 2019), *adopted*, 2019 WL 5110501 (D. Del. Aug. 26, 2019). Thus, Plaintiff's intentional misrepresentation claim is at least partially barred under the economic loss and gist of the action doctrines.[10]

---

[10] *See Gea Sys. N. Am. LLC v. Golden State Foods Corp.*, 2020 WL 3047207, at *9 (Del. Super. June 8, 2020) ("These allegations do not point to any misrepresentation of existing fact. Furthermore, if a complaint alleges that 'the parties had a contract and [the defendant] intended not to follow through with its obligations under the [contract] and nothing more,' then a 'fraud

Plaintiff's negligent misrepresentation claim is barred in its entirety. The economic loss doctrine "prevents plaintiffs from recovering in tort for losses suffered that are solely economic in nature." *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F. Supp. 2d 519, 526 (D. Del. 2012) (citations omitted). The lone exception for a negligent misrepresentation claim requires that the defendant be "in the business of supplying information." *Id.* at 527 (citation omitted).[11] Here, however, no Defendant is "in the business of supplying information." Plaintiff's negligent misrepresentation claim is accordingly barred. *See Delaware Art Museum v. Ann Beha Architects, Inc.*, 2007 WL 2601472, at *4 (D. Del. Sept. 11, 2007); *Brasby*, 2007 WL 949485, at *7.

**IV.     Plaintiff's Misrepresentation Claims are Barred by the Agreements in Question.**

Plaintiff claims that it was fraudulently induced to enter into the Amending Agreement and the Settlement Agreement. *See* AC ¶¶ 34, 36. However, the plain language of those agreements precludes Plaintiff from arguing that it relied on any representations prior to their execution and accordingly bars Plaintiff's misrepresentation claims. *See* LSA §§ 13, 17; Amending Agreement § 2; Settlement Agreement §§ 1, 7.5, 7.8, [7.12]. Under Delaware law, "sophisticated parties to negotiated commercial contracts may not reasonably rely on information that they contractually agreed did not form a part of the basis for their decision to contract." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003) (citation omitted). In both agreements, Plaintiff

---

claim would be an impermissible bootstrap of [the] breach of contract claim.'") (dismissing intentional misrepresentation claim); *see also Downs v. Andrews*, 639 F. App'x 816, 820–21 (3d Cir. 2016) ("[W]e need not decide whether fraud in the inducement claims are categorically barred under the gist of the action doctrine because the pleadings demonstrate that this case is about a failure to perform under the contract. Plaintiffs' complaint demonstrates that the primary basis for alleging that fraudulent activity induced the contract is the fact that the notes were not all delivered in accordance with the contract, not a failure to fulfill a separate societal duty which may exist in other cases.") (citation omitted)) (affirming dismissal of fraudulent inducement claim).

[11] "Delaware courts have found a defendant in the business of supplying information . . . when 'information is the end and aim product of a defendant's work.' When, however, the 'information supplied is merely ancillary to the sale of a product or service . . . defendant will not be found to be in the business of supplying information.'" *Id.* (citations omitted).

expressly warranted that it was exclusively relying on the advice of counsel in signing them and agreed that prior negotiations and representations were superseded and disclaimed. Critically, Plaintiff warranted that it had "***adequate opportunity to make whatever investigation or inquiry*** [it] may deem necessary or desirable ***in connection with the subject matter of this Agreement prior to the execution hereof***." Settlement Agreement § 7.5. This provision broadly covers Plaintiff's renewed approval (to the extent it was even necessary) of the APAs and the TAR amount defined therein through the Settlement Agreement and necessarily applies to the representations Frank allegedly made prior to the Amending Agreement's execution. *See id.* §§ 1, 7.5.[12] Thus, Plaintiff cannot now claim that it was induced into either of these agreements or that it otherwise relied on any representations in so doing when it expressly disclaimed such reliance. *See S.C. Johnson & Son, Inc. v. Dowbrands, Inc.*, 111 F. App'x 100, 109 (3d Cir. 2004).[13]

## V.     Plaintiff Otherwise Fails to Plausibly Allege Claims for Misrepresentation.

To the extent Plaintiff's tort claims survive despite the foregoing, Defendants are still entitled to judgment because Plaintiff has failed to plausibly allege those claims. To establish a fraud claim under Delaware law, Plaintiff must prove ***each*** of the following elements:

(1) a false representation of material fact; (2) the defendant's knowledge of or belief as to the falsity of the representation or the defendant's reckless indifference to the truth of the representation; (3) the defendant's intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance.

---

[12] Notably, to the extent Plaintiff claims its approval was required for these transactions to take place, the Settlement Agreement was the document that ultimately conveyed such consent and thereby allowed the closings to take place. The Amending Agreement was merely a steppingstone, so Plaintiff's entry into that agreement was effectively unnecessary once the Settlement Agreement was signed. Thus, any representation that allegedly induced Plaintiff into executing the Amending Agreement should be disregarded as it was superseded by Plaintiff's execution of the Settlement Agreement, which Plaintiff alleges resulted from an entirely different set of representations. Those March 23, 2017, representations cannot be attributed to Frank as discussed below.

[13] *See also H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142–43 (Del. Ch. 2003); *Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 555–56 (Del. Ch. 2001).

*El v. Davis*, 2013 WL 1914233, at *2 (D. Del. May 7, 2013) (citation omitted).[14]  Here, Plaintiff's

claims are simply not plausible on their face. Nor has Plaintiff plausibly alleged *any* of the required

elements of these claims.[15]  For each of the independent reasons below, Plaintiff's claims fail.

### A.  Plaintiff's Allegations are Implausible.

Plaintiff claims that it was defrauded when Defendants provided him allegedly false

information regarding the basis for the TAR figure.  However, this claim ignores the indisputable

fact that the TAR figure was freely negotiated and *defined by* the OC1 Defendants *and Sellers* as

part of their arms'-length transaction as an accurate representation of the size of the businesses at

close for purposes of calculating the Companies' valuation. *See, e.g.*, APAs (executed by both

parties and defining TAR); AC ¶ 35. Plaintiff does not allege that Sellers did not have access to

their own Companies' financials such that they would have been misinformed about their value

and the revenue derived from active services. Plaintiff has averred to multiple courts that Sellers

also represented that TAR was based on active services.  *See, e.g.*, D.I. 1, at ¶¶ 23, 25; Ex, E ¶¶

21, 24.  However, Plaintiff makes no claim that Sellers were involved in the alleged fraud, nor

could it plausibly do so. To suggest that Sellers effectively defrauded themselves is implausible

and unsupported by any allegations in the Amended Complaint. Although the APAs' effect with

---

[14]  Except for intent, the elements of intentional and negligent misrepresentation are identical.

[15]  Defendants will also demonstrate that these statements were not false at the appropriate time if
necessary.  However, for purposes the current procedural posture, because Plaintiff does not allege
that Sellers participated in the alleged fraud, it is implausible that Sellers would have represented
that the TAR figure was based on active services if that were not true. Moreover, it makes no sense
why Frank would have made such an easily disprovable misrepresentation, particularly given that
he knew Plaintiff had access to the company financial data to confirm the representation.  *See* Ex.
B (the spreadsheet Plaintiff provided to Frank within the context of that discussion containing
detailed company revenue data). As for Hantz, he merely "confirmed" that Plaintiff would "be
satisfied BEFORE anyone else." *See* Ex. C (emphasis in original); AC ¶ 80. Under the plain
language of the APAs, Plaintiff was to be – and was in fact – paid *before* anyone else. *See* APAs
§§ 2.3(b), 2.4(f). Hantz was not wrong as a result. Plaintiff merely contends that it was not
compensated to the extent it believed it should have been under the APAs. Thus, even at this stage,
Plaintiff has not plausibly alleged that the information provided to Plaintiff was inaccurate.

respect to payouts remains disputed, Sellers unquestionably stood to financially benefit from a higher company valuation and thus a larger earnout pot under either parties' reading. Thus, to believe Plaintiff's claims is to believe that Sellers, with knowledge of their own Companies' financials, either (a) based the sale of their own Companies on inaccurate information to their detriment or (b) intentionally bolstered TAR to their own detriment. Neither of which is believable or true (or alleged in this case).[16] As such, Plaintiff's claims should be dismissed.[17]

### B. The Basis for the TAR Figure, on which Plaintiff Allegedly Relied, was Immaterial.

The basis for the TAR figure could not have been of material importance to Plaintiff. Plaintiff's knowledge regarding how the TAR was derived is immaterial and irrelevant because it was *specifically defined* by informed parties negotiating at arms' length. Plaintiff knew what the "benchmark" was at the time of each of the alleged misrepresentations. *See* AC ¶ 30.

Moreover, Plaintiff could have done nothing to change the TAR figure or how it was derived. To the contrary, Plaintiff was contractually obligated to: (1) "refrain from any behavior, action or conduct that impedes, interferes with or disrupts the Sale process;" (2) not unreasonably withhold its approval to the extent it was required; and (3) stay out of the parties' negotiations. *See* LSA §§ 8–9. Thus, any efforts to upend the parties' transaction on grounds related to the basis for the negotiated TAR would have been in breach of Plaintiff's contractual obligations to Seller. Even if Plaintiff's consent was required for Sellers to enter into the APAs, it would have been unreasonable for Plaintiff to withhold consent based on its failure to participate in those

---

[16] Because Plaintiff's claim for intentional misrepresentation should be dismissed as discussed above, and that is the lone claim for which Plaintiff could even potentially be entitled to punitive damages in this case, its demand for punitive damages should be stricken. *See Gea Sys. N. Am. LLC*, 2020 WL 3047207, at *11. Plaintiff's claim for attorneys' fees should also be stricken because it has alleged no entitlement to such relief in the Amended Complaint.

[17] The Court may be the ultimate factfinder in this case because Plaintiff is bound by the APAs' jury waiver clause. *See Hostforweb Inc. v. Cloud Equity Grp. SIM LLC*, 2019 WL 6033648, at *3 (N.D. Ill. Nov. 14, 2019).

negotiations, because of the basis for the TAR, or even due to its lack of an understanding of the basis of the TAR figure for that matter.  Thus, regardless of what Defendants allegedly represented as *the basis for* the TAR, the resulting earnout payment to Plaintiff was never going to change because the TAR was a fixed amount explicitly defined by the OC1 Defendants and Sellers in the APAs.[18] Plaintiff cannot plausibly allege that its understanding of the basis for the TAR was material or even consequential as a result. *Cf. S.C. Johnson & Son, Inc.*, 111 F. App'x at 109 n.10.

### C. Plaintiff Did Not Reasonably Rely on the Alleged Representations.

Plaintiff's contentions that Defendants' alleged representations induced it to enter into either agreement is also demonstrably inaccurate based on the email communications relied upon in the Amended Complaint.

As the March 1, 2017, emails reveal, Plaintiff had already accepted and approved of the

---

[18]  This point also belies Plaintiff's ability to plausibly claim damages. Plaintiff alleges: "Had the Target Annual Revenue figure in fact been based on the active service as of close, upon information and belief, Plaintiff would have been entitled to all or most of the full earnout amount." AC ¶ 84. However, because TAR was a defined term under the APAs, Plaintiff's earnout payment was never going to change regardless of what Defendants represented as the basis for the TAR figure or what its basis actually was for that matter.  As such, Plaintiff cannot plausibly allege that it was damaged due to its belief that TAR was based on "active services" even if it was based on some other metric. *See Brevet Cap. Special Opportunities Fund, LP v. Fourth Third, LLC*, 2011 WL 3452821, at *8 (Del. Super. Aug. 5, 2011). Moreover, had Plaintiff not entered into these agreements, Plaintiff contends that the APAs never would have been executed and the transactions would not have taken place. If that were the case, Plaintiff would not have been paid anything in connection with the Settlement Agreement or from the proceeds of the sales because there would have been no settlement and no sales. *See* LSA § 4 (setting sales deadline as March 31, 2017; the closings here occurred March 23, 2017). Not to mention, Sellers had full authority to proceed with the sales regardless of Plaintiff's execution of the Settlement Agreement. *See* LSA, Recitals. If Plaintiff's consent was required, then language would exist in the Amending Agreement and/or Settlement Agreement authorizing Sellers to enter into the APAs. To the contrary, the recitals in the LSA already acknowledged that Sellers had such authority. Thus, Plaintiff's entry into those agreements actually put Plaintiff in a better position than it would have been otherwise. Indeed, these sales were the only way Plaintiff stood any chance of recouping the money Sellers owed because, as Plaintiff admits, the businesses were on the verge of collapse and could not afford their debts. *See* AC ¶ 33; Ex. D. These transactions and the funds received in connection therewith were Plaintiff's lifeline as a result. Plaintiff needed the OC1 Defendants; it was not the other way around.

13

earnout arrangement prior to executing the Amending Agreement. On March 1, 2017 at 11:07 a.m., Plaintiff plainly admitted: "I understand that ***I signed off [on this payout]*** and I am not moving backward." *See* Ex. A (emphasis added). Plaintiff had already executed the LSA (dated January 26, 2017) by that point and had already been given the draft APAs including the defined TAR figure. *See* Am. Compl ¶¶ 30, 34. If Plaintiff had already signed off on the payout structure in its LSA, then it could not have been induced to enter into the Amending Agreement based on Frank's subsequent alleged representation regarding "active service." Korneyev was not waiting for Frank to respond to execute that agreement; he was waiting for his lawyer to give him the "green light," *see* Ex. A; and indeed he allegedly did not execute the agreement for several days thereafter, *see* AC ¶ 34. Importantly, there is no allegation, nor could there be, that Plaintiff would not have entered into the Amending Agreement but for Frank's alleged representation regarding active services.[19] *See Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at \*5 (Del. Ch. Jan. 13, 2014). Because Plaintiff was contractually prohibited from involving himself in the parties' negotiations, withholding consent based on concerns over the meaning of a negotiated term would have been unreasonable and in violation of the LSA.[20]

---

[19] At least one Delaware court has found that statements made prior to an *amended* contract "do not relate to the inducement of Plaintiff to enter into a contractual relationship." *See Brasby*, 2007 WL 949485, at \*8 ("This result is unaltered by the contract modification which took place on November 19, 2003. A valid, albeit executory, contract was in place prior to the November 19 modification. Any representations made by Morris between the initial contract date and November 19 did not alter the validity of the Home Contract. Consequently, the allegedly fraudulent representations made by Morris in his representative capacity do not relate to the inducement of Plaintiff to enter into a contractual relationship.").

[20] Also notably, the email discussion in which Frank made the alleged representation was in the context of the payout structure as set forth in the original LSA, which was then amended through the Amending Agreement to remove in its entirety the very provision Frank and Plaintiff were discussing. For example, Section 5(d) of the LSA discusses a six-month calculation. The email exchange at issue references that six-month period. *See* Ex. A. Plaintiff states: "As you read the agreement I signed, it clearly states that it will be 6 months, however, there are no details." *Id.* Frank replies, specifically clarifying his previous statements in question: "Your payout per your litigation stay agreement states that it will compare the annualized revenue on the closing date

14

Moreover, Plaintiff was ***still inquiring*** as to the "base revenue amounts" in the March 23 emails on which he alleges to have relied in entering into the Settlement Agreement. *See* Ex. C. If Frank provided information sufficient to induce Korneyev into entering into the Amending Agreement as alleged, then Korneyev would not still be asking his attorney the same questions for clarification over three weeks later (on the Closing date). *See also supra*, n.13. This demonstrates that Frank's prior alleged representations did not satisfy or inform Plaintiff on that issue. Because Frank is not alleged to have made ***any other*** representations to Plaintiff (and indeed he did not) between the conversation on March 1 and this exchange on March 23, Frank cannot have made any representation that would have induced Plaintiff to enter into the Settlement Agreement either.

Plaintiff's contention that subsequent representations by Frank's "agent" (Hantz) induced its execution of the Settlement Agreement is equally untenable. *See* AC ¶¶ 53–54. Frank is not himself a party to any agreement involved in this transaction (nor is he alleged to be), so ***Frank*** did not have an "agent" in this case. Rather, Hantz was legal counsel to the OC1 Defendants, not Frank individually. Thus, Frank cannot be individually liable for any representations by Hantz. And importantly, Frank was not even copied on the March 23, 2017, emails though which Plaintiff

---

(meaning the 3/15 date per the example in your last e-mail) to the T+6mo anniversary date. In other words, it's an evaluation just of the 6 months following the close[.]" *Id.* However, the Amending Agreement removed the Section 5(d) that Frank and Plaintiff were discussing ***in its entirety*** and replaced it with a new payout provision that made no reference to that six-month period. *See* Amending Agreement § 1(i). Plaintiff alleges that the Amending Agreement was signed on March 5, 2017 (despite that the only date thereon shows "February"). *See* AC ¶ 34. Thus, whatever alleged representation Frank made during that exchange was not even within the context of the operative Amending Agreement provision relevant to Plaintiff's claims, which is where the defined TAR first appeared as part of the draft APAs. *See* Amending Agreement § 1(i). The subsequent changes to that document, which negated the terms being discussed in these emails, would have accordingly mooted Frank's representations regarding the removed provision. Indeed, Frank was not even a party to the Amending Agreement, and there is no allegation that he participated in drafting it or even had knowledge of its contents. As a result, Plaintiff cannot reasonably allege that discussions regarding a superseded provision induced it to sign an agreement containing wholly different payout provisions.

alleges it was induced into signing the Settlement Agreement. *See* Ex. C.[21]

Nor can Hantz (or Frank) be said to have failed to correct Plaintiff's statements in the March 23 exchange. Plaintiff further alleges that Defendants had a "duty to correct" Plaintiff's statement regarding "active service" in this March 23 email "when it was conveyed to them that Plaintiff was closing the transactions on the understanding the figure was derived from active service as of closing." *See* AC ¶ 76. However, Plaintiff makes only a single conclusory allegation that Hantz "knew or should have known was untrue or misleading" about what TAR represented or whether it was based on "active service." *See* AC ¶ 77. Indeed, there is no allegation (nor would one be plausible or accurate) that Hantz was even aware of the private email exchange between Plaintiff and Frank weeks earlier. Thus, to the extent Hantz even had a duty to do so, he could not correct what he did not know to be allegedly untrue. If even ***Sellers*** understood TAR to be based on active services, Ex. F ¶ 21, Hantz should certainly not be expected to know any different.

Further, the actual March 23 communications reveal that it was never "conveyed to [Frank and Hantz] that Plaintiff was closing the transactions on the understanding the figure was derived from active service as of closing" as alleged. *See* AC ¶ 76; Ex. C. Plaintiff's email (to his attorney) merely states: "I need to know what the base revenue amounts that they are using the formula. So

---

[21] Notably, Plaintiff's questions in this March 23, 2017, exchange were posed ***to Plaintiff's counsel***, not to Frank (who was not even copied on these emails) or Hantz. *See id.* In turn, Hantz's responses were made to counsel, not to Plaintiff. Instead of interpreting the plain language of the APAs himself, Plaintiff's counsel punted to Hantz, and then presumably just relayed that information to Plaintiff. Plaintiff's counsel could have easily confirmed Hantz's alleged representations through a plain reading of the APAs, but failed to do so. Plaintiff, a sophisticated entity, and its counsel's failure to either interpret the language of the APAs themselves or insist upon clearer language therein should not be imputed to Defendants (and certainly not Frank) as a result. *See also* Settlement Agreement §§ 1, 7.5, 7.8, [7.12]. Thus, these allegations, in light of the actual communications on which they are based, represent nothing more than Plaintiff's and its legal counsel's failure to conduct ***any*** due diligence of their own whatsoever. *See Harris v. Innovate Biopharmaceuticals, Inc.*, 2019 WL 5173782, at *8 (Del. Super. Oct. 15, 2019), *aff'd*, 228 A.3d 1063 (Del. 2020).

16

CE would export all active services for both WHB and HFW." Ex. C (sic). On a plain reading, no reasonable person, and certainly not Hantz, could have understood this statement to mean that Plaintiff believed the TAR – which was already defined and which Plaintiff had already agreed to weeks prior – was based on active services. Thus, even if Hantz was aware of Frank's prior alleged misrepresentation (and there is only an implausible, conclusory allegation that he was), he had no duty to correct what no reasonable person could understand as conveying what Plaintiff now contends. Nor can Plaintiff plausibly claim to have justifiably relied on Hantz's response, which simply reads: "Regarding #5, attached are the current (and basically final) versions of the APAs to which you can refer for the calculations of the conditional payments." *Id.* Thus, neither Frank nor Hantz made any representation regarding the baseline figure upon which Plaintiff could have reasonably relied. Plaintiff was asking about the baseline figure, and Hantz responded with copies of the APAs where the TAR figure could be found.

Plaintiff's separate contention that it was also misled by this exchange with respect to the order of payment under the APAs is equally untenable. This is a question of contractual interpretation. The Third Circuit has ruled that sophisticated parties cannot reasonably rely on representations by the other regarding unambiguous contractual provisions. *See Westchester Fire Ins. Co. v. Household Int'l, Inc.*, 167 F. App'x 895, 901 (3d Cir. 2006).

Finally, the reasonableness of Plaintiff's reliance also depends on its role in the transaction and its access to information, including whether it had a duty to investigate. Under Delaware law, where a representation "relates to a matter as to which the parties have not equal means of information, but is peculiarly within the knowledge of the person making the representation," no duty to investigate exists and a party is entitled to rely on it. *See S.C. Johnson & Son, Inc.*, 111 F. App'x at 108 (citation omitted). However, the situation is very different here. Because Plaintiff

had revenue and billing data and copies of the APAs in its possession, the parties had "equal means of information" and the alleged representations were not "peculiarly within the knowledge of" Defendants. *See supra*, n.9. Thus, Plaintiff was not entitled to blindly rely on Defendants' alleged representations, and any such reliance could not have been reasonable as a result. *See Harris*, 2019 WL 5173782, at *8, *aff'd*, 228 A.3d 1063; *S.C. Johnson & Son, Inc.*, 111 F. App'x at 108–09; *Davis*, 75 F. Supp. 3d at 640–41 ("'[T]he recipient of a fraudulent misrepresentation ... is ... required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'") (citation omitted)).

### D. Plaintiff Has Not Plausibly Alleged Intent.

Plaintiff's contention that Defendants intended to induce it into entering into the Amending Agreement and Settlement Agreement is deficient for at least two additional reasons. *First*, this allegation depends on the inaccurate notion that Plaintiff's consent was required for these transactions to close, particularly from Defendants' perspective, and the plausibility of the underlying bases articulated in Paragraph 81 of the Amended Complaint. The only contractual provision that arguably requires Plaintiff's approval with respect to the transactions in any way is found in the LSA, which states that a buyer had not yet even been identified, so obviously Defendants had no hand in it. That agreement simply requires Plaintiff to approve the earnout formula in the APAs – which it did through the Amending Agreement – in exchange for merely staying its litigation against Sellers. *See* LSA § 9; Amending Agreement § 1(i). No other provision in any contract requires Plaintiff's approval or consent whatsoever. Thus, there was no contractual obligation between Plaintiff and any Defendant requiring Plaintiff's approval. To the contrary, Plaintiff was contractually obligated stay out of the parties' negotiations and not unreasonably

18

withhold whatever consent was required. *See* LSA §§ 8–9. Thus, any efforts to upend the parties' transaction on grounds related to the basis for the negotiated TAR, as Plaintiff suggests, would have been in breach of Plaintiff's contractual obligations to Seller. *See also supra*, n.18.

Moreover, even if not unreasonably withheld, the consequence of Plaintiff's refusal to consent would have been inconsequential to Defendants. Although Plaintiff could have resumed litigation against Sellers, the OC1 Defendants could still have proceeded to purchase the Companies' assets from Sellers or simply backed out of a troubled deal, and Sellers could still have sold the Companies' assets to raise capital to pay off (directly themselves, without Plaintiff's participation in the sale to receive Seller's share) any monies owed to Plaintiff.[22] Indeed, Sellers had full authority to proceed with the sales regardless of Plaintiff's execution of the Settlement Agreement. *See* LSA, Recitals. If Plaintiff's consent was required, then language would exist in the Amending Agreement and/or Settlement Agreement authorizing Sellers to enter into the APAs. To the contrary, the recitals in the LSA already acknowledged that Sellers had such authority. Thus, neither a failure to settle the litigation nor Plaintiff's lack of consent would have been of great concern to Defendants because the transactions could have proceeded regardless.[23]

---

[22] Notably, Plaintiff's allegation that Defendants intended the alleged representations to "induce the Plaintiff to release its lien on shares of stock" is demonstrably false because Plaintiff never had such a lien as the attached historical lien search reveals. *See* Ex. E (public search showing no lien).

[23] Plaintiff also claims that Defendants' alleged fraud was intended to secure a release of claims against them. *See* AC ¶ 81. However, the release of claims against the OC1 Defendants was both unnecessary, as discussed above, and illusory, and thus would have been of no value to them. That release effectively states: "if Buyer does not breach the APAs, Plaintiff will not sue Buyer for breach of the APAs." *See* Settlement Agreement § 5.3. This is little more than a truism. This provision also purports to release the OC1 Defendants from "all claims relating to payment of the balance of the VTB." However, Plaintiff could have no such claim against the OC1 Defendants as that dispute was exclusively between Plaintiff and Sellers, and, again, this was simply an asset deal. *See id.* at Recitals. This purported release is the only benefit conveyed to the OC1 Defendants through either agreement in question. And indeed, Frank was not a party to either agreement individually. Thus, the basis for any Defendant's intent, especially Frank's, to have allegedly made an easily verifiable misrepresentation to induce Plaintiff to enter into these agreements is lacking.

*Second*, even if Defendants had a reason to induce Plaintiff into providing its consent (and they did not), the emails in question do not suggest any intent (or effort whatsoever) on Frank's part. *See* Ex. A. This is clearly not a scenario in which Frank **intended** to **induce** Plaintiff into executing the Amending Agreement by allegedly representing that TAR was based on "active services." *See id.*; *Kuhn Const. Co.*, 844 F. Supp. 2d at 530. TAR was already defined, and Plaintiff had the draft APAs **with the TAR figure in its possession** when each of the alleged representations occurred. *See* AC ¶ 30.[24] Thus, Plaintiff has not alleged and cannot allege plausible grounds for Defendants' intent to induce Plaintiff into either agreement by providing allegedly misleading information regarding the basis for the TAR. The litigation's settlement and Plaintiff's consent were not required, and Defendants stood to gain nothing from structuring these transactions such that Plaintiff was paid Sellers' share of the proceeds directly.[25]

## CONCLUSION

Given the foregoing, Defendants respectfully request that their Motion be granted.

---

[24] Plaintiff also contends that Defendants intended to conceal how the APAs' earnout formula was structured, but this is contrary to the plain terms of the APAs which include the formula in detail.

[25] Plaintiff alternatively contends that each of the Defendants were "unjustly enriched by retaining portions of the earnout that should have flowed to Plaintiff." *See* AC ¶ 95. However, this claim should also be dismissed as a matter of law because no dispute exists that valid contracts govern the earnout payment. *See, e.g.*, *id.* ¶ 57. Plaintiff also contends that this claim serves as an alternative to its misrepresentation claims. However, the fact that valid contracts govern this question is dispositive, and, even if it were not, a claim of unjust enrichment is no alternative to claims of misrepresentation. Moreover, other than the conclusory allegation that Defendants retained funds, Plaintiff's allegations that those funds were used as **setoffs** for **indemnified** amounts means that, by definition, no Defendant retained or could have been enriched by those funds. *See, e.g.*, *id.* ¶¶ 52, 66. And as for Frank, Plaintiff has alleged nothing to suggest that he could have been personally enriched from the alleged conduct in this case.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Branden P. Moore
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
(412) 667-7908 – Telephone
bmoore@mcguirewoods.com

Dated:  August 30, 2021

By:  */s/ Jesse L. Noa*
John A. Sensing (#5232)
Jesse L. Noa (#5973)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000 – Telephone
jsensing@potteranderson.com
jnoa@potteranderson.com

*Attorneys for Defendants*

21